ACCEPTED
12-15-00287-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
12/11/2015 2:03:07 PM
Pam Estes
CLERK

## NO. 12-15-00287-CV

IN THE COURT OF APPEALS
TWELFTH COURT OF APPEALS
TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
12/11/2015 2:03:07 PM
PAM ESTES
Clerk

HEALTH CARE SERVICE CORPORATION, AN UNINCORPORATED
DIVISION OF WHICH IS BLUE CROSS AND BLUE SHIELD OF TEXAS,

*Appellant*,

vs.

EAST TEXAS MEDICAL CENTER,

*Appellee*

On Appeal from the
241st Judicial District Court of
Smith County, Texas
The Honorable Jack Skeen, Presiding Judge

## APPELLEE EAST TEXAS MEDICAL CENTER'S BRIEF IN RESPONSE TO APPELLANT'S MOTION TO STAY TEMPORARY INJUNCTION

**DEBORAH RACE**
**STATE BAR NO. 16448700**
**IRELAND, CARROLL & KELLEY, PC**
**6101 S. BROADWAY, SUITE 500**
**TYLER, TEXAS 75703**
**TEL: (903) 561-1600**
**FAX: (903) 581-1071**
drace@icklaw.com

*ATTORNEY FOR EAST TEXAS MEDICAL CENTER*

TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

INDEX OF AUTHORITIES................................................................................. iii

INTRODUCTION.................................................................................................1

RESPONSE TO BCBS' BACKGROUND FACTS ....................................................4

1.     For years ETMC has sought inclusion as an in-network institutional provider in BCBS PPO and during those years, BCBS has failed to comply with Section 1301.051 of the Insurance Code by unreasonably and negligently withholding that designation.. .............................................4

2.     The trial court acted within it discretion in granting this injunction, and ETMC, by introducing extensive evidence, more than met its burden to prove it was entitled to injunctive relief.........................................................6

3.     The trial court made extensive findings which were supported by the evidence. ...................................................................................................11

SUMMARY OF THE ARGUMENT .................................................................11

ARGUMENT AND AUTHORITIES .................................................................14

1.  This injunction should remain in place pending this appeal and trial. ...........14

2.  BCBS' continued unreasonable refusal to permit ETMC to be an in-network institutional provider without any explanation was negligent and in violation of the Insurance Code. ........................................................17

3.  BCBS is not being "coerced" into a contract with ETMC, but was simply ordered to cease and desist from excluding ETMC from its PPO network pending trial at rates dictated by BCBS. BCBS has already done this, so any harm BCBS alleges will be caused by implementing the injunction should not be a factor. .....................................21

4. The injunction as entered was more than supported by the record, and the trial court acted well within its discretion granting ETMC this relief. ..................................................................................22

5. While BCBS styled its motion as also being one to review the denial of supersedeas under Rule 29.2, BCBS never asked the trial court for a supersedeas bond..................................................................24

CONCLUSION AND PRAYER FOR RELIEF ...................................................26

CERTIFICATE OF SERVICE ...................................................29

INDEX OF AUTHORITIES

**CASES**

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198,
  (Tex. 2002).......................................................................... 2, 11, 13, 14, 18

*LaFaucheur v. Williams*, 807 S.W.2d 20
  (Tex.App.—Austin 1991, no writ.) ............................................................. 13, 23

*Love v. Travelhost, Inc.*, 156 S.W.3d 615
  (Tex.App.—Dallas 2004, no pet.) ........................................................14

*RP&R, Inc. v. Territo*, 32 S.W.3d 396
  (Tex. App.—Houston [14th Dist.] 2000 ................................................17

*Triantaphyllis v. v. Gamble,* (Tex. App. – Houston
  [14th Dist.] 2002, pet. denied)). ..............................................................2

*Tri Star Petroleum Co. v. Tipperary Corp.*101 S.W.3d 583
  (Tex. App. – El Paso 2003, no pet.).............................................. 18, 19

**STATUTES**

Tex. Ins. Code §1301.051 ........................................ 4, 5, 6, 14, 16, 19, 20

**RULES**

Tex.R.App.P.  29.2........................................................................24

Tex.R.App.P. 29.3........................................................................25

Tex.R.App.P. 24 ........................................................................26

## INTRODUCTION

This case, including the accelerated appeal and underlying suit, represents an exceptional case, and one of extreme importance to not only the appellee, East Texas Medical Center ("ETMC")[1], but also to the entire East Texas community. But for the district court's order, which appellant [Health Care Service Corporation, an unincorporated division of which is Blue Cross Blue Shield of Texas ("BCBS")] asks this Court to stay, ETMC will not be able to fulfill its mission or to continue to offer the level of services it currently offers and upon which the community relies. (11-10-15 hearing Vol 1[2] 72 ll 7-9). ETMC's mission is:

> We continuously strive to bring an unmatched spirit of excellence to the art and science of health care. We measure our success by how our efforts improve the quality of life for people in communities in East Texas.

(RR1 58 ll 4-8). As Byron Hale, Senior VP and CFO for ETMC explained, "Your Honor, we've exhausted all available remedies. We must have this to maintain our mission." (RR1 87 ll 10-11). And as the record confirms, Mr. Hale was correct.

---

[1] ETMC Regional Healthcare System is actually made up of numerous regional hospitals throughout East Texas, with ETMC Tyler being the flagship. While all of the regional hospitals are in BCBS PPO network, ETMC Tyler has remained excluded. (RR 1 88 ll 10-25). ETMC is the only full-service acute care hospital in Texas that is involuntarily excluded from the BCBS PPO network. Throughout this response, ETMC will be used to refer to ETMC Tyler.

[2] The 1st volume of the November 10, 2015, hearing on the Application for Temporary Injunctive Relief will be referred to as RR1.

1

As noted, this is an accelerated appeal from the granting of a temporary injunction. The Texas Supreme Court has instructed that:

> Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Walling*, 863 S.W.2d at 58; *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984) A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion. *Walling*, 863 S.W.2d at 58; *Walker*, 679 S.W.2d at 485. The reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Johnson v. Fourth Ct. of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985); *Davis v. Huey*, 571 S.W.2d 859, 861-62 (Tex. 1978).

*Butnaru v. Ford Motor Co*., 84 S.W.3d 198, 204 (Tex. 2002).

While this response is filed in relation to BCBS' request for this Court to stay the injunction pending this accelerated appeal, BCBS appears to go much further into the actual merits of its appeal. The real question at issue at this stage should be whether emergency relief is really necessary. *See Triantaphyllis v. Gamble*, 2002 Tex.App. LEXIS 3747, *4 (Tex. App. – Houston [14th Dist.] 2002, pet. denied). And as seen below, it is not. BCBS has never articulated that it will suffer any harm by either the issuance of this injunction or allowing the injunction to remain in place. However, because BCBS has elected to delve much deeper into the merits at this stage, ETMC will follow suit.

From the very first page of its motion to stay filed in this Court, BCBS paints a false impression of the injunction and the harm it alleges it will cause BCBS. For example, BCBS argues that the injunction requires BCBS to contract

2

with ETMC, and argues that if BCBS prevails on appeal the contract will need to be undone, leading to the confusion of ETMC patients and BCBS members. (Mtn at 1). However, as shown below, the injunction did not require BCBS to contract with ETMC, but simply required it to designate ETMC as an in-network PPO provider at rates dictated by BCBS and already in place pending the trial. (A copy of the injunction is included at Tab 1 of the Appendix).

BCBS also contends that "Without a stay, both BCBS and the public will be harmed." *Id.* It argues that some of that harm will come from BCBS having to unwind the contract if it ultimately prevails, leading to disruption of care and the confusion of patients and BCBS members alike. *Id.* However, BCBS has largely already complied with the injunction and designated ETMC as a BCBS in-network PPO provider. In fact, BCBS' website now reflects that ETMC Tyler is in-network and states: "The cost of inpatient and outpatient care provided by this acute care hospital is somewhat more affordable compared to peers." (RR Supp. Motion Ex. 1). As a result, patients and members alike have had and are continuing to schedule procedures at ETMC under this new arrangement.[3] BCBS is also already pre-certifying its members for in-network services at ETMC and is accurately reimbursing ETMC under the rates set forth in the injunction.

---

[3] As Mr. Carroll noted in his letter to this Court on the date BCBS filed this motion ETMC had already treated 492 Blue Cross PPO patients and had 181 more scheduled for procedures. Those numbers have increased to 630 treated since then. (A copy of Mr. Carroll's letter is contained at Tab 2 of the Appendix).

One other misimpression left by BCBS' opening statement, and even the title of its motion, is BCBS' complaint that the district court refused to supersede the judgment. BCBS even asks this Court in the title of its motion to "review the denial of supersedeas." While BCBS requested the trial court to stay the implementation of this injunction, BCBS never requested any form of supersedeas in the underlying proceedings.

The Honorable Jack Skeen was careful in granting this injunction, even questioning a BCBS representative at length in an attempt to be sure he fully understood BCBS' argument. (RR1 pp. 270-284). Judge Skeen did not abuse his discretion in granting the temporary injunction, and for all of the reasons set forth below, ETMC respectfully asks that this Court not stay the injunction pending this Court's decision on BCBS' accelerated appeal.

### RESPONSE TO BCBS' BACKGROUND FACTS

1. **For years ETMC has sought inclusion as an in-network institutional provider in BCBS PPO and during those years, BCBS has failed to comply with Section 1301.051 of the Insurance Code by unreasonably and negligently withholding that designation.**

BCBS is correct that there has never been an in-network PPO contract between ETMC Tyler and BCBS, but it wasn't for lack of effort on ETMC's part. The evidence showed that ETMC has consistently sought inclusion as an institutional provider in BCBS PPO network for at least two decades and for at least the past ten years BCBS has never even bothered to explain why ETMC Tyler

4

has not been allowed that designation. (RR1 65 ll 1-13). While BCBS argues that this is all perfectly legal (Mtn at 3), ETMC believes its exclusion from BCBS' PPO is negligent and also illegal under Section 1301.051 of the Texas Insurance Code. That section reads:

> **(a)** An insurer shall afford a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider to practitioners and institutional providers and to health care providers other than practitioners and institutional providers, if those other health care providers are included by the insurer as preferred providers, provided that the practitioners, institutional providers, or health care providers:
>> **(1)** are licensed to treat injuries or illnesses or to provide services covered by a health insurance policy; and
>> **(2)** comply with the terms established by the insurer for designation as preferred providers.
>
> **(b)** An insurer may not unreasonably withhold a designation as a preferred provider.
>
> **(c)** An insurer shall give a physician or health care provider who, on the person's initial application, is not designated as a preferred provider written reasons for denial of the designation.
>
> **(d)** Unless otherwise limited by this code, this section does not prohibit an insurer from rejecting a physician's or health care provider's application for designation based on a determination that the preferred provider benefit plan has sufficient qualified providers.
>
> **(e)** An insurer may not withhold a designation to:
>> **(1)** a podiatrist described by Section 1301.0521; or
>> **(2)** an optometrist, therapeutic optometrist, or ophthalmologist described by Section 1301.0522.

Tex. Ins. Code §1301.051.

As the evidence proved, ETMC has never been afforded a fair, reasonable and equivalent opportunity to be designated as a preferred institutional provider. (RR1 177 ll 3-11). Additionally, ETMC has not been given any reason in at least

5

the past ten years, much less a written one, why this designation has been withheld. (RR1 65 ll 4-13; 178 ll 4-5). Judge Skeen himself questioned BCBS' representative in an attempt to understand its actions in excluding ETMC Tyler, which as the evidence showed was the only full-service, acute care hospital in the entire state that is involuntarily out of network. (RR2 Pl Ex. 1). Judge Skeen asked: "I mean, how does that distinction come about that all of these other 270 – it's in evidence – that are in Blue Cross – are in the network, but Medical Center – East Texas Medical Center is not, which is clearly rated as one of the top hospitals in the state? That's what I'm having trouble with." (RR1 276 ll 15-21). Reading the entire dialogue between the judge and this witness establishes that Judge Skeen acted well within his discretion in deciding that that BCBS had no reasonable explanation for excluding ETMC. (RR1 270-284).

2. **The trial court acted within it discretion in granting this injunction, and ETMC, by introducing extensive evidence, more than met its burden to prove it was entitled to injunctive relief.**

While ETMC initially filed suit seeking money damages, it amended its petition to seek injunctive relief after it became clear that ETMC's survival and continued ability to provide vital services in the community and region were at stake. (A copy of ETMC's amended petition is included at Tab 3 of the Appendix). At the hearing on ETMC's application for temporary injunction, the evidence established that although ETMC had tried to make cuts and save money to fight

6

diminishing revenue, the financial impact of being out of network with BCBS had reached a point that ETMC could no longer fulfill its mission and was going to have to begin cutting vital services. (RR1 72-73).

In its motion, BCBS tells this Court that ETMC failed to point to any authority that BCBS had a legal obligation to enter into a PPO contract. To the contrary, ETMC cited to the Insurance Code in its petition as constituting the legal obligation with which BCBS repeatedly failed to comply. And moreover, ETMC offered extensive proof of this and BCBS' negligence as well.

Also contrary to BCBS' argument (Mtn at 5), ETMC offered extensive evidence that barring this injunction, it would suffer probable, imminent and irreparable injuries. As noted above, Byron Hale, ETMC's CFO, testified at length about ETMC's current critical financial situation. He explained that without the injunction, ETMC could not continue to fulfill its mission and could not continue the many services it offered. (RR1 72 ll 7-9). He explained that he saw the Level 1 Trauma Center at risk, as well as potential reductions in the ground and air ambulance programs and the renal transplant program. (RR1 72-73).

Four doctors who practice at ETMC testified as well. Dr. Stephen Gale, a trauma surgeon testified that he believed the Level 1 trauma designation was at risk. (RR1 118 ll 13-25). The next closest Level 1 trauma center is in Dallas. (RR1

110 ll 11-18). Dr. Gale also testified that the lack of in-network status hurt the continuity of care and the doctor/patient relationship. (RR1 117 ll 7-22).

Dr. Steve Potter, the program director for ETMC's renal transplant program, testified that other cuts would affect his program and could also result in the renal program being closed. (RR1 134 ll 9-20). Dr. Potter also testified that when patients did have a kidney transplant, their care was fragmented afterward due to ETMC being out-of-network, so like Dr. Gale, he believed the continuity of care and doctor-patient relationship were negatively impacted. (RR1 133 ll 18-33). Dr. Potter also testified that if these cuts were to happen, then a large segment of the East Texas population currently served by ETMC's renal transplant program would go without care due to the patient's and their family's financial inability to afford to travel and stay in Dallas for their surgery and approximately six weeks of follow-up care. (RR1 135 ll 3-17). Dr. Ken Kaminski, an orthopedic surgeon, also testified that it didn't make any sense to him that ETMC was not included in BCBS' network and said that he also found ETMC's exclusion to be an intrusion into the doctor-patient relationship. (RR1 145 ll 12-19).

And finally, Dr. Stephen Rydzak, Chairman of the Department of Medicine and also a board member at ETMC, testified. (RR1 153-185). When asked if it made sense that ETMC was not in the BCBS network, Dr. Rydzak explained that: "It makes no sense at all. In fact, it really degrades our ability to fulfill our mission

and the whole concept of having a tertiary referral center where these outlying hospitals are able to send their sickest patients to the hospital that's best positioned to care for them, that has the most expertise. It completely obliterates that as far as the feasibility of being able to do it for these Blue Cross Blue Shield patients." (RR1 157 ll 7-18).

Dr. Rydzak further explained ETMC's financial policy when treating out-of-network patients. He testified that, by way of example, when an out-of-network patient has a procedure at ETMC, BCBS only pays for 50% of the procedure, while it pays 80% for an in-network patient. Under ETMC's policy, ETMC essentially absorbs the 50% that isn't paid by BCBS for the out-of-network patient. (RR 160-162). The evidence also established that ETMC already has a contract with BCBS that sets forth for the payment rates for ETMC as an out-of-network provider. (RR1 227 ll 4-10). The injunction actually ordered these same rates be paid, stating that the rates should be "identical to those in force in the Hospital Agreement for Traditional Indemnity Business in effect between ETMC and Blue Cross. . . ." (Appx Ex. 1).

Dr. Rydzak was also asked about BCBS' request at the hearing that the trial court let it try to work something out with ETMC. Dr. Rydzak responded: "No, sir. I think that that was a declaration for the benefit of the Court. I've been on the hospital board for 15 years, and we haven't heard anything from Blue Cross Blue

Shield in that period of time that even remotely suggested an interest in having talks, despite our best efforts to encourage them." (RR1 165 ll 19-24; 176 ll 2-7).

While BCBS contends that ETMC offered little evidence of its financial crisis, that was not the case. (Mtn at 5). BCBS wants this Court to only consider its side, when the fact is ETMC offered extensive evidence of its dire financial situation. As noted above, CFO Byron Hale testified about possible cuts that would have to be made if the injunction was not granted. He explained the continuing downward trend for cash on hand, and also explained that ETMC bonds had been downgraded by both Moodys and Fitch bond rating agencies. (RR1 75-77). Mr. Hale also testified that the reason given by Moody's for the downgrade was "ETMC's long standing out-of-network status for the Tyler facility." (RR1 76 ll 25; 77 ll 1-9). Mr. Hale testified that ETMC was losing over one million dollars a month. (RR1 76 ll 23-24). And while Byron Hale admitted that the system had $300,000,000 on hand, Dr. Rydzak explained that it owed $400,000,000 to the bond-holders and others. (RR1 176 ll 15-25).

ETMC presented ample evidence of its financial troubles, the impact of BCBS' unreasonable refusal to grant it in-network status and the likelihood that the change in that status to in-network would greatly benefit ETMC's current financial situation. BCBS takes issue with ETMC's evidence that its continuing to be an out-of-network provider will result in any substantial cuts or decrease in services. (Mtn

at 7). BCBS writes, "Beyond the testimony of its CFO, ETMC offered only the testimony of four physicians who testified that they and their patients would be harmed if ETMC went out of business or was forced to cut services." (Mtn at 7).In the first place, the testimony of ETMC's CFO alone was more than sufficient. And in the second, as seen above, these four doctors testified that they believed their programs were at a serious risk.

3. **The trial court made extensive findings which were supported by the evidence.**

BCBS admits that the district court made the requisite findings in the injunction on each element for issuing a temporary injunction, but complains there was no evidence supporting what BCBS calls the court's "purported findings." (Mtn at 7). As seen above, there was ample evidence to support these findings. And the trial court made the exact findings it was required to make in support of the injunction, namely that ETMC had proved the three specific elements it was required to prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *See Butnaru*, 84 S.W.3d at 204.

In *Butnaru,* the court also noted that: "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Id.* The trial court made these findings as well. And the trial court did not just make cursory findings, but instead

made detailed, express findings, including that: "ETMC has proved that, absent the requested relief, it will suffer a probable, imminent and irreparable injury in the interim before trial." (Appx. Ex.1 at 2). The court also found that: "Unless admitted immediately to the Blue Cross PPO's, ETMC will not be financially able to maintain its current level of comprehensive medical care to the community pending trial on the merits." *Id.* As the injunction itself reflects, the trial court carefully considered and weighed the evidence and made findings supporting the injunctive relief.

BCBS complains that the trial court "conclusorily stated that ETMC's injuries are not compensable by money damages and that BCBSTX 'will suffer no harm of any significance if the requested relief is granted'." (Appx. Ex. 1 at 3). The fact is, BCBS own representative, Mr. Towsley, had testified at a deposition one week before this hearing that he didn't know of any harm BCBS would suffer by the injunction. (RR1 206 ll 19-25). At the hearing, Mr. Towsley attempted to explain his prior answer, but he still did not testify that BCBS would be harmed by including ETMC in its network. Instead, he said, "What we don't know is what would happen." (RR1 207 ll 2-3).

Finally, contrary to BCBS' representation that the injunction required it to contract with BCBS, it did not. The injunction simply ordered that ETMC be allowed to participate in BCBS' PPO networks at rates already in force "until new

12

PPO agreements are negotiated and signed." There is no requirement that this be done prior to trial. Instead, the injunction orders that ETMC be allowed to be an in-network provider at rates already set by BCBS until the trial finally resolves the matter.

As noted above,

> Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Walling*, 863 S.W.2d at 58; *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984). A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion. *Walling*, 863 S.W.2d at 58; *Walker*, 679 S.W.2d at 485. The reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Johnson v. Fourth Ct. of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985); *Davis v. Huey*, 571 S.W.2d 859, 861-62 (Tex. 1978).

*Butnaru*, 84 S.W.3d at 204. BCBS makes much of its argument that this was a mandatory injunction. However, since the standard of review is the same whether the injunction is prohibitive or mandatory, that determination is not critical to this appeal. *See LaFaucheur v. Williams*, 807 S.W.2d 20, 22 (Tex.App.—Austin 1991, no writ.).

BCBS argues that a stay is warranted "to avoid irreparable injury to BCBSTX and the public, and to preserve BCBSTX's appeal rights." (Mtn at 9). Yet, BCBS could never explain to the trial court what harm it would suffer.

13

Moreover, it placed ETMC in-network apparently without much difficulty shortly after the order was entered. BCBS cannot show that this trial court abused its discretion in granting this injunction.

A trial court does not abuse its discretion with respect to a decision on a temporary injunction when it bases its decision on conflicting evidence and the record reflects that the evidence reasonably supports the court's conclusion. *See Davis v. Huey*, 571 S.W.2d 859, 562 (Tex. 1978). Additionally, it was the trial court that was able to observe the witnesses and determine their credibility. In *Love v. Travelhost, Inc.*, 156 S.W.3d 615, 620 (Tex.App.—Dallas 2004, no pet.) the court wrote: "We are mindful that the trial judge was able to observe the witnesses and make a determination as to their credibility. Because there is some evidence that Love and Little Bit Productions were competing with Travelhost, we cannot conclude that the trial judge abused his discretion." Here, the record establishes that there was ample evidence supporting the trial court's conclusion. Judge Skeen weighed the evidence, to the extent he even questioned BCBS' witness to attempt to understand BCBS' position.

Further, the court's temporary injunction was necessary to preserve the status quo. "A temporary injunctions purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru,* 84 S.W.3d at 204. The litigation's subject matter was BCBS' unreasonable refusal to put ETMC

in-network. The status quo at the time of the hearing was that ETMC offered a myriad of unique and vital services to the residents of East Texas and that many of those very services and patient relationships would be jeopardized if ETMC could not operate as a BCBS in-network provider pending trial. In contrast, BCBS could not articulate any harm placing ETMC in-network would cause, and in fact almost immediately put ETMC in-network as reflected by BCBS' own website. ETMC also advised the trial court and BCBS that it would willingly go to trial in April, rather than November 2016, if that was what BCBS wanted and the trial court confirmed it had availability at that time and was willing to set the trial for then as well. (RR1 24 ll 21-25, 25 ll 1-4; 258 ll 20-21; 336).

BCBS maintains that it has complied with the law and made a good faith effort to negotiate with ETMC (Mtn at 11), but as reviewed above, the evidence showed otherwise. BCBS contends that "Even though the parties' failure to arrive at an agreement through negotiations with ETMC is neither a Code violation nor a tort, ETMC filed this lawsuit presumably to get the trial court to mandate the contract terms ETMC wants and exert leverage on BCBSTX." (Mtn at 11). To the contrary, the evidence as summarized above, confirms that in the past ten years BCBS never provided ETMC with any reason ETMC Tyler was excluded from the network and it also confirms that there were never any real good faith negotiations.

A reading of Section 1301.51 of the Insurance Code confirms that BCBS was not in compliance.

The evidence ETMC presented to the trial court more than supported its request for this injunction. Contrary to BCBS' protestations in its motion, ETMC proved (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

ARGUMENT AND AUTHORITIES

**1. This injunction should remain in place pending this appeal and the trial.**

BCBS first argues that "courts should stay mandatory injunctions pending appeal." This case has yet to be tried and there is no appeal on the merits, only this accelerated appeal asking this Court to stay the injunction pending trial. ETMC showed it was entitled to this relief and can show that there was no abuse of discretion, so the injunction should remain in effect pending this appeal and the trial on the merits.

Further, there is nothing in this injunction that will either moot this or any ultimate appeal, or significantly undermine any relief to which BCBS may show itself entitled at trial. (Mtn at 12-13). As mentioned above, BCBS has already put ETMC in its network, patients have been seen and procedures scheduled. While ETMC is confident it will ultimately prevail, it is unclear how leaving ETMC in

the network pending a trial will render this or any ultimate appeal on the merits moot or undermine any relief BCBS may be awarded.

BCBS argues this is a mandatory injunction and that "a stay is particularly appropriate" in this case. (Mtn at 13). However, this particular injunction actually preserved the status quo in that it allowed ETMC to continue offering vital and unique services to the residents of East Texas pending the trial. BCBS cites to *RP&R, Inc. v. Territo*, 32 S.W.3d 396, 401 (Tex. App.—Houston [14th Dist.] 2000, no pet.) as support for the proposition that "A temporary mandatory injunction changes the status quo and should be granted only in a case of extreme hardship." (Mtn at 13). While this statement may be true as to mandatory injunctions, nonetheless ETMC proved that it would suffer an extreme hardship. Additionally, the court in *RP&R* only found an abuse of discretion since Territo failed to appear at the hearing and there was no evidence at all in the record that he would suffer any extreme hardship or irreparable injury were he not to receive the relief. *Id.* ("Accordingly, we hold the trial court abused its discretion in granting a temporary mandatory injunction providing for such unsupported relief.").

BCBS again tells this Court that without a stay, the public and BCBS's appeal will be mooted. (Mtn at 13). However, as it failed to articulate the harm it would suffer to the trial court, it fails to explain any harm to this Court as well. While the injunction required BCBS to put ETMC in-network, it also preserved the

status quo of the subject of the litigation by allowing ETMC to continue to provide the many vital services it provides to doctors and patients in the community. As stated at the outset, this is truly an exceptional case.

While BCBS sets out one of the usual definitions of "status quo" in its motion, namely "the last, actual, peaceable, non-contested status which preceded the pending controversy," (Mtn at 14), in *Butnaru*, the Texas Supreme Court stated: "A temporary injunctions purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru,* 84 S.W.3d at 204. Here, the status quo encompasses more than just the immediate relationship of the parties at the time of the hearing, and this has been held to also be within the trial court's discretion. *Tri Star Petroleum Co. v. Tipperary Corp*.101 S.W.3d 583, 588 (Tex. App. – El Paso 2003, no pet.).

In *Tri Star*, the trial court had actually found the status quo to be something other than the relationship between the parties at the time of the hearing, and despite that being altered by the injunction, the appellate court found the injunction within the court's discretion and actually a prohibitive, rather than mandatory injunction. The court wrote,

> Tri Star contends that the trial court in effect granted a mandatory injunction, which altered the status quo without a showing of extreme hardship or other special circumstance to justify this remedy. The temporary injunction order prohibits Tri Star from interfering with Tipperary's assumption of control and operation of the Project as the successor Operator. The order also requires Tri Star to relinquish

operations and cease acting as Operator of the Project. We find that the trial court's injunction is prohibitive in nature. While the order requires Tri Star to take some affirmative action in allowing Tipperary to assume operation of the Project, the action required on Tri-Star's part is incidental to its non-interference with the successor Operator's assumption of control in the interim. We overrule Issue Seven."

*Id*., at 592-93.

## 2. BCBS' continued unreasonable refusal to permit ETMC to be an in-network institutional provider without any explanation was negligent and in violation of the Insurance Code.

BCBS contends that the Insurance Code does not require it to "contract with and designate a provider as a preferred provider in the PPO network." (Mtn at 15). But the Insurance Code does require BCBS "to afford a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider to practitioners and institutional providers." Tex. Ins. Code §1301.051(a). It also requires BCBS to "not unreasonably withhold a designation as a preferred provider." §1301.051(b). And it requires BCBS "to give a physician or health care provider who, on the person's initial application, is not designated as a preferred provider written reasons for denial of the designation." §1301.051(c). The evidence presented to the trial court established that BCBS had failed to do all three.

BCBS relies upon subsection 1301.51(d) as the provision that gives it carte blanche to ignore the rest of the section. Subsection (d) provides that "Unless otherwise limited by this code, this section does not prohibit an insurer from rejecting a physician's or health care provider's application for designation based

on a determination that the preferred provider benefit plan has sufficient qualified providers." Tex. Ins. Code §1301.51(d). However subsection "d" would be limited by sections "a, b and c" and BCBS would still have the obligation to give ETMC a fair, reasonable and equivalent opportunity to apply, to not unreasonably withhold this status from ETMC and to give ETMC a reasonable reason in writing should it deny its request.[4]

So contrary to BCBS' argument, the status quo with respect to the existing relationship between ETMC and BCBS was unlawful. Moreover, as discussed above, the trial court could have interpreted the status quo much more broadly than just that relationship at that point in time.

---

[4] Essentially, BCBS contends that its denial of ETMC's application was justified under subsection (d) because the Texas Department of Insurance ("TDI") found its networks to be "adequate." But this argument misconstrues the statutory language and would render Section 1301.051 superfluous. Subsection (d) simply states that the section "does not prohibit" an insurer from denying an application based upon the *sufficiency* (not adequacy) of its providers. It does not state that the TDI's determination of network adequacy is, by itself, always a reasonable basis for denying a provider's application, nor does it state that, in any and all circumstances, an insurer may deny an application by a provider based upon the purported sufficiency of its existing network providers. According to Section 1301.051, an insurer must always afford "a fair, reasonable, and *equivalent* opportunity to apply to be *and to be designated* as a preferred provider" and must always have a reasonable basis for denying an application. That the statute "does not prohibit" an insurer from rejecting an application for a certain reason does not mean that its rejection of an application for that reason is always reasonable. The critical question under Section 1301.051 remains whether the insurer afforded a reasonable, fair and equivalent opportunity to be designated as a preferred provider and whether the insurer has a reasonable basis for denying an application. Under BCBS' interpretation of Section 1301.051, an insurer could always deny a provider's application – regardless of the reasonableness of the opportunities afforded to the provider – as long as the TDI certifies that its provider network is "adequate." But such certification is a prerequisite for any PPO network in the State of Texas. Thus, under BCBS' interpretation of subsection (d), the requirements of subsections (a) and (b) would be superfluous.

**3. BCBS is not being "coerced" into a contract with ETMC, but was simply ordered to cease and desist from excluding ETMC from its PPO network pending trial at rates dictated by BCBS. BCBS has already done this, so any harm BCBS alleges will be caused by implementing the injunction should not be a factor.**

BCBS also argues that the implementation of the injunction will harm BCBS if not stayed pending this appeal. But again, this appeal actually involves a request to stay the injunction pending trial. And contrary to BCBS's argument, the injunction does not coerce BCBS to "enter into a more permanent PPO contract" with ETMC. Instead, the injunction simply ordered that BCBS cease and desist from excluding ETMC from BCBS PPO's pending the trial, expressly noting that the case was set for trial in November, but that ETMC and the trial court had advised BCBS that it can be tried in April 2016 if the parties agree. (Appx Ex. 1 at 4). The injunction requires that BCBS: "Cease and desist from excluding ETMC from the Blue Cross PPOs by allowing ETMC's immediate and full participation in Blue Cross's Blue Options and Blue Choice PPO networks at rates identical to those in force in the Hospital Agreement for Traditional Indemnity Business in effect between ETMC and Blue Cross (effective August 15, 2012, as amended effective September 15, 2015), attached as Exhibit A to this Order, until new PPO agreements are negotiated and signed." This provision has no requirement that new agreements be negotiated and signed before the trial.

BCBS also argues that "the injunction will create confusion and cause hardship for the public, the very doctors and patients the injunction purports to protect." (Mtn at 17). Yet, BCBS has already implemented the injunction; ETMC Tyler is already listed as being in-network and BCBS's website even states that "[t]he cost of inpatient and outpatient care provided by this acute care hospital is somewhat more affordable compared to peers." (RR Supp. Motion Ex. 1). BCBS argues that "If BCBSTX prevails on appeal (or in the underlying litigation) and is not required to contract with ETMC as an in-network provider, courses of treatment that began in reliance on the injunction's grant of in-network status might be disrupted. This is not an idle concern." (Mtn at 18). If this had truly been such a grave concern to BCBS, then BCBS would have sought this emergency relief before it put ETMC in-network, instead of waiting until the last day to file the notice of appeal and request a stay. Since the date of the injunction, at least 886 patients have already been treated and 156 more are scheduled, so BCBS' argument regarding disrupting scheduled treatments should carry little, if any, weight.[5]

As already discussed, enforcing the injunction does not risk mooting this existing accelerated appeal or any future appeal. Contrary to BCBS' argument, the injunction does not "effectively coerce BCBSTX to enter into longer term

---

[5] These numbers change almost daily, and ETMC is happy to provide this Court with the current numbers at the time of the argument as well.

22

contracts with ETMC" before trial. (Mtn at 19). BCBS is under no obligation to contract with ETMC by virtue of this injunction. Additionally, while it may appear that BCBS has made all of its arguments in this motion that it will make in this accelerated appeal, it can certainly make more if it so chooses. And having ETMC remain in-network per the terms of the injunction will not moot those arguments. BCBS is not being forced to enter into a longer term contract with ETMC – it can continue on at rates that were already in place before the injunction.

4. **The injunction as entered was more than supported by the record, and the trial court acted well within its discretion granting ETMC this relief.**

Here, BCBS cites cases that say to grant a mandatory temporary injunction requires a showing of extreme hardship with substantial and probative evidence. (Mtn at 20). BCBS argues this is a mandatory injunction and that "a stay is particularly appropriate" in this case. (Mtn at 13). ETMC believes the question as to whether this is a prohibitive or mandatory injunction is a red herring. The standard of review is the same whether the injunction is prohibitive or mandatory. *See LaFaucheur*, 807 S.W.2d at 22. And as discussed above in the Summary of the Argument, this particular injunction actually preserved the status quo in that it allows ETMC to continue offering vital and unique services to the residents of East Texas pending the trial. BCBS argues that a trial court abuses its discretion unless it is clearly established by the facts that one seeking such relief is threatened with an actual irreparable injury without the injunction. *Id.* ETMC presented the court

with substantial evidence that it would suffer an actual irreparable injury and extreme hardship without the injunction.

ETMC also established that it had a viable cause of action and proved a probable right to relief. BCBS argues that ETMC had no private cause of action under the Insurance Code, but granting ETMC's application for injunctive relief did not turn on this answer. ETMC's suit and application were also based in part on its claim that Blue Cross was negligent in unreasonably refusing to designate ETMC as an in-network provider. Further, contrary to BCBS' argument, the evidence showed that ETMC had not been provided a fair and reasonable opportunity to be granted this status and that BCBS had acted negligently and unreasonably in its dealings with ETMC over the years.

As set forth in the factual summary, ETMC proved that it would suffer probable, imminent and irreparable injury and that the trial court was well within its discretion to so find, considering the testimony and evidence presented. The trial court made the required findings on all of the elements supporting the injunction in his order and had the evidence in the record to support each one.

5. **While BCBS styled its motion as also being one to review the denial of supersedeas under Rule 29.2, BCBS never asked the trial court for a supersedeas bond.**

On the last page of its motion, BCBS advises that while this Court has the authority to make any temporary orders necessary to preserve the parties' rights

until the disposition of the appeal, and while BCBS is prepared to post an appropriate bond, "no security is necessary in the circumstances presented here." (Mtn at 25). In connection with this argument, BCBS states that: "This accelerated appeal likely will be decided within four to five months." BCBS contends that: "[i]n that short period of time, ETMC will not have obtained any significant monetary benefit from enforcement of the injunction. Because it takes time for patients to switch to a different provider (here, BCBSTX members switching to ETMC), it is unlikely that ETMC would see increased revenues in the short time it will take to decide this accelerated appeal. Therefore, no security is necessary to protect ETMC from the consequences of non-enforcement pending appeal." (Mtn at 25).

BCBS' very arguments why it believes no supersedeas bond is needed, support ETMC's argument that the injunction should remain in force. BCBS failed to show the trial court that it would suffer any harm, and likewise has failed to show or even allege that it will suffer any real harm should the injunction continue. This is in stark contrast to ETMC's showing that it will likely suffer immediate and irreparable harm without the injunctive relief.

BCBS relies upon Rule 29.3 as support for its request for a stay by this Court. That rule reads:

> When an appeal from an interlocutory order is perfected, the appellate court may make any temporary orders necessary to preserve the parties' rights until disposition of the appeal and may require appropriate security. But the appellate court must not suspend the trial court's order if the appellant's rights would be adequately protected by supersedeas or another order made under Rule 24.

Tex.R.App.P. 29.3. As seen above, no orders are necessary to preserve the parties' rights until the disposition of this appeal. BCBS never sought nor received a supersedeas bond in connection with its request for a stay. BCBS never asked the trial court for a supersedeas bond or suggested what amount of supersedeas, if any, would be appropriate. BCBS simply asked the trial court to stay the order and now simply argues that the trial court's injunction should be set aside.

BCBS has not proved it is entitled to any relief under Rule 29.3. It could never articulate to the trial court the harm it would suffer if the injunction were entered and it has not articulated that harm here. In contrast, ETMC established that it would suffer an irreparable and extreme hardship, and thus proved itself entitled to this relief.

## CONCLUSION AND PRAYER FOR RELIEF

The trial court acted well within its discretion in granting the injunctive relief sought by ETMC. The court was careful in considering the evidence and testimony and even went so far as to ask several questions in an attempt to understand BCBS' actions and arguments. ETMC established that it would suffer irreparable and catastrophic harm if the injunction were not granted. In contrast, to

26

this day, BCBS has never really been able to explain how the injunction will cause it any harm.  And as noted above, BCBS has already complied with the injunction. It would seem had BCBS really been concerned that it would be harmed by the injunction it would have sought emergency relief before implementing the changes mandated by the injunction.

For all of the reasons stated herein, ETMC respectfully prays that this Court deny BCBS' motion to stay the injunction pending its accelerated appeal and trial. Additionally, ETMC asks for any and all relief to which it may be entitled in law or equity.

Date: December 11, 2015                              Respectfully submitted,

                                                     /s/ *Deborah Race*
                                                     **DEBORAH RACE**
**OF COUNSEL:**                                      **STATE BAR NO. 16448700**
                                                     **OTIS CARROLL**
**DAVID C. FREDERICK**                               **STATE BAR NO. 03895700**
**EDUARDO F. BRUERA**                                **COLLIN MALONEY**
**KELLOG HUBER HANSEN,**                             **STATE BAR NO. 00794219**
**TODD, EVANS & FIGLE, PLLC**                        **IRELAND, CARROLL & KELLEY, PC**
**1615  M STREET, N.W. STE 400**                     **6101 S. BROADWAY, SUITE 500**
**WASHINGTON, D.C. 20036**                           **TYLER, TEXAS 75703**
**(202) 326-7900**                                   **TEL: (903) 561-1600**
**dfrederick@khhte.com**                             **FAX: (903) 581-1071**
**ebruera@khhte.com**                                drace@icklaw.com
                                                     otiscarroll@icklaw.com
                                                     cmaloney@icklaw.com

27

T. JOHN WARD
STATE BAR NO. 20848000
CLAIRE ABERNATHY HENRY
STATE BAR NO. 24053063
WARD, SMITH, & HILL PLLC
1127 JUDSON ROAD, SUITE 220
LONGVIEW, TX 75601
(903) 757.6400
TJW@WSFIRM.COM
CLAIRE@WSFIRM.COM


MICHAEL C. COKER
ADAMS & COKER, P.C.
STATE BAR. NO. 04527100
4540 KINSEY DRIVE
TYLER, TX 75703
(903) 581.1196
MIKECOKER@ADAMS-COKER.COM

SCOTT STEVENS
STATE BAR NO. 00792024
DAVID P. HENRY
STATE BAR NO. 24027015
STEVENS HENRY, PLLC
P. O. BOX 3427
LONGVIEW, TX 75606
TEL: (903) 753-67670
FAX: (903) 753-6761
SCOTT@STEVENSHENRY.COM
DAVID@STEVENSHENRY.COM

*ATTORNEYS FOR EAST TEXAS MEDICAL CENTER*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system. Any other counsel of record will be served by facsimile transmission and/or first class mail this 11th day of December, 2015.

/s/ Deborah Race
Deborah Race

NO. 12-15-00287-CV

IN THE COURT OF APPEALS
TWELFTH COURT OF APPEALS
TYLER, TEXAS

HEALTH CARE SERVICE CORPORATION, AN UNINCORPORATED
DIVISION OF WHICH IS BLUE CROSS AND BLUE SHIELD OF TEXAS,

*Appellant*,

VS.

EAST TEXAS MEDICAL CENTER,

*Appellee*

On Appeal from the
241st Judicial District Court of
Smith County, Texas
The Honorable Jack Skeen, Presiding Judge

# APPENDIX

## VERIFICATION

The documents attached as Tab 1 -3 are true and correct copies of documents which have already been filed or received by this Court in connection with this matter.

/s/ Deborah Race
Deborah Race

# TAB 1

CAUSE NO. 15-1165-C

| | | |
|---|---|---|
| EAST TEXAS MEDICAL CENTER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 241st JUDICIAL DISTRICT |
| | § | |
| BLUE CROSS & BLUE SHIELD OF TEXAS, | § | |
| a Division of HEALTH CARE SERVICE | § | |
| CORPORATION, AETNA HEALTH, INC., | § | |
| AETNA LIFE INSURANCE COMPANY, | § | |
| CIGNA HEALTHCARE OF TEXAS, INC., | § | |
| and CIGNA HEALTH AND LIFE | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Defendants. | § | SMITH COUNTY, TEXAS |

FILED

NOV 1 0 2015

LOIS ROGERS
CLERK 241st JUD. DIST. COURT. SMITH CO., TX
BY _____ DEPUTY

## TEMPORARY INJUNCTION AND ORDER SETTING FINAL TRIAL ON THE MERITS

On this the 10th day of November, 2015, the Court heard the application for temporary injunction filed by plaintiff East Texas Medical Center ("ETMC"). ETMC and defendant Blue Cross & Blue Shield of Texas ("Blue Cross") appeared in person and through their respective attorneys of record. After considering the application, the pleadings, the testimony of witnesses, the evidence admitted, and the arguments of counsel, the Court finds that the application should be GRANTED, and Blue Cross should be ENJOINED as requested.

ETMC has brought claims against Blue Cross (and others) for, inter alia, negligence in breaching the duties imposed on insurers under Tex. Ins. Code §§ 1301.051(a) and 1301.051(b). The Court finds that (at least) ETMC's negligence claim pleads a cause against Blue Cross.

The Court further finds that ETMC has proved a probable right of relief on (at least) its negligence claim against Blue Cross. Specifically, ETMC has presented some evidence tending to sustain the allegations that Blue Cross (i) has failed to give it a fair, reasonable, and equivalent opportunity to be designated as a preferred provider in Blue Cross's preferred provider benefit plans ("Blue Cross PPOs"); (ii) has unreasonably excluded ETMC from the Blue Cross PPOs, and

1

(iii) will likely continue to unreasonably exclude ETMC from the Blue Cross PPOs pending trial on the merits. That evidence is sufficient to show that a bona fide issue exists as to ETMC's right to ultimate relief on its negligence claim against Blue Cross.

The Court further finds that ETMC has proved that, absent the requested relief, it will suffer a probable, imminent, and irreparable injury in the interim before trial. Specifically, unless enjoined, Blue Cross will likely continue to exclude ETMC from the Blue Cross PPOs, resulting in irreparable harm and extreme hardship to ETMC and members of the public. Unless admitted immediately to the Blue Cross PPOs, ETMC will not be financially able to maintain its current level of comprehensive medical care to the community pending trial on the merits. In this regard, it will likely be forced to slash the medical services it provides, thereby resulting in either destruction, or significant disruption, of its operations. Either result would necessarily disenable ETMC's ability to fulfill its mission of continuously striving to bring an unmatched spirit of excellence to the art and science of healthcare in East Texas and improving the quality of life for the people and communities of East Texas. Those injuries would be measured by the disruption or destruction of ETMC's ability to provide quality care to the people of East Texas. Such injuries cannot be measured by any certain pecuniary standard, and therefore cannot be compensated by money damages. ETMC has therefore proved probable, imminent, and irreparable injury to itself absent the requested injunctive relief.

In addition, ETMC's inability to continue providing the current level of medical care-will result in imminent irreparable harm and extreme hardship to the public at large. The loss of not only ETMC's unique services, but also its hospital capacity, will detrimentally affect the healthcare needs of the citizens of East Texas through, inter alia, a decrease in treatment options, less continuity of care for East Texas patients, unreasonable interference with the doctor-patient

2

relationship, the loss of services provided only by ETMC in the area, and the lost capacity of one of the two large hospitals in Smith County.

The evidence shows that ETMC's exclusion from the Blue Cross PPOs leaves it out-of-network for the vast majority of privately-insured patients in Smith County and East Texas. Because of the increase in the differential between payments for in-network services and out-of-network services, the evidence shows that fewer and fewer patients can and will chose out-of network providers such as ETMC. This means that physicians often cannot use ETMC as a treatment option for their patients--even when those physicians believe that ETMC would provide the best care of their patients and the optimum integration of clinical services and continuity of care--resulting in fewer practical treatment options, unreasonable interference with the doctor-patient relationship, and less continuity of care for East Texas patients. This situation has skewed ETMC's patient make-up to such a degree that ETMC is now losing money on its hospital operations each month. Without immediate access to privately-insured patients under the Blue Cross PPOs, ETMC will be unable to maintain its current level of comprehensive medical care services to the community before a trial on the merits. Thus, without injunctive relief, ETMC will be unable to fulfill its mission of continuously striving to bring an unmatched spirit of excellence to the art and science of healthcare, the success of which is measured by ETMC's impact on the quality of life for the people and communities in East Texas. ETMC's closure, or significant reduction in the services it provides, would result in irreparable injury and extreme hardship to East Texas patients who would have fewer health care options and no access to the services which only ETMC provides in the area. Accordingly, the evidence demonstrates and the Court finds that this temporary injunction is necessary to prevent irreparable harm and extreme hardship to ETMC and members of the public. The Court also finds that Blue Cross will suffer no harm of any significance if the requested relief is granted. The equities therefore weigh overwhelmingly in

3

favor of ETMC and the residents of East Texas--and overwhelmingly against Blue Cross--because the total or partial loss of ETMC's services would constitute an extreme hardship and result in injuries not compensable by money damages.[1]

ACCORDINGLY, IT IS ORDERED that the application is GRANTED. Blue Cross and its agents, employees, independent contractors, attorneys, representatives and persons or entities in active concert or participation with Blue Cross who receive actual notice of this order by personal service or otherwise, are ordered to desist and refrain from breaching Blue Cross' duties to ETMC by taking the following actions until the Court enters a final judgment in this case:

1. Cease and desist from excluding ETMC from the Blue Cross PPOs by allowing ETMC's immediate and full participation in Blue Cross's Blue Options and Blue Choice PPO networks at rates identical to those in force in the Hospital Agreement for Traditional Indemnity Business in effect between ETMC and Blue Cross (effective August 15, 2012, as amended effective September 15, 2015), attached as Exhibit A to this Order, until new PPO agreements are negotiated and signed;

2. Cease and desist from excluding ETMC from its electronic preferred provider directories by listing ETMC as an in-network provider; and

3. Cease and desist from restricting ETMC's right and ability to market itself as an in-network preferred provider in Blue Cross's Blue Options and Blue Choice PPO networks.

IT IS FURTHER ORDERED that a trial on the merits of this case is set before this Court on November 14, 2016, ~~th~~ ~~or in April, 2016, if agreed on between the parties,~~ in the located in the Smith County Courthouse, 100 N. Broadway Room 220, 100 N. Broadway, Room 220, Tyler, TX 75601.

---

[1] Although not essential to the injunction granted herein, the Court finds that ETMC will likely prevail on the merits with respect to its claims that Blue Cross has violated Texas Insurance Code § 1301.051(a) and (b) by (i) failing to afford ETMC a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Blue Cross PPOs, and (ii) unreasonably withholding from ETMC designation as a preferred provider in the Blue Cross PPOs, respectively. The Court further finds that in the absence of a temporary injunction, Blue Cross will continue its present conduct which will result in likely violations of the Texas Insurance Code causing irreparable harm and extreme hardship to ETMC and the public.

4

IT IS FURTHER ORDERED that the Clerk of this Court, upon the filing by ETMC of the bond required below, and on approving the bond according to the law, shall issue a temporary injunction in conformity with the terms of this Order. This Order shall not be effective unless and until ETMC executes and files with the Clerk a bond in the amount of $ _10,000.⁰⁰_ which may be deposited with the Clerk in cash or by a cashier's check.

SIGNED on _November 10ᵗʰ_, 2015, at _6:00_ a.m./p.m.

_Jack Skeen, Jr_
PRESIDING JUDGE

5

Exhibit A

**NOTICE AMENDMENT NUMBER 6 TO**
**BLUE CROSS AND BLUE SHIELD OF TEXAS,**

**HOSPITAL AGREEMENT**
**FOR TRADITIONAL INDEMNITY BUSINESS**

This Notice Amendment ("Amendment") is entered into by and between Blue Cross and Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company ("BCBSTX") and East Texas Medical Center Regional Healthcare System (" Hospital ").

WHEREAS, BCBSTX and Hospital have entered into that certain, BCBSTX Hospital Agreement effective August 15, 2012 ("Agreement"); and

WHEREAS, BCBSTX may unilaterally amend the Agreement to revise the inpatient Contract Base Rate in accordance with the Revenue Neutral Base Rate section of Exhibit B the Agreement with thirty (30) days Notice to Hospital.

NOW, THEREFORE, BCBSTX hereby notifies Hospital that BCBSTX modified the inpatient Contract Base Rate effective        .

1.  The provisions of this Amendment shall be treated as strictly confidential under the confidentiality provisions of the Agreement.

2.  Except as modified by this Amendment, the Agreement remains unchanged and in full force and effect.

**Multiple Counterparts.** This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the undersigned have executed this Amendment to be effective as of the Effective Date set forth below.

**BCBSTX**

**A scanned, imaged, electronic, photocopy or stamp of the signatures hereunder shall have the same force and effect as an originally executed signature**

Authorized Signature:

_Shara McClure_ (signature)

Name: _____Shara McClure_____

Title: __Vice President, Network Management__

Date: _____7-14-15_____

Effective Date: _____9-1-15_____

RNBRAMD0612

CONFIDENTIAL

BCBSTX0329

# TAB 2

# IRELAND, CARROLL & KELLEY, P.C.

## ATTORNEYS AT LAW

6101 SOUTH BROADWAY, SUITE 500
SOUTH BROADWAY AT GRANDE BLVD.
TYLER, TEXAS 75703
(903) 561-1600

*Mailing Address:*
POST OFFICE BOX 7879
TYLER, TEXAS 75711
FAX (903) 581-1071

OTIS CARROLL
PATRICK KELLEY*
DEBORAH RACE**
COLLIN M. MALONEY
MANDY CARROLL NELSON

DONALD CARROLL (1929-1992)
H. KELLY IRELAND (Retired)

*Board Certified - Business Bankruptcy Law
Texas Board of Legal Specialization

**Board Certified - Civil Appellate Law
Texas Board of Legal Specialization

December 1, 2015

The Honorable Pam Estes
Clerk of the Twelfth Court of Appeals
1517 West Front Street, Ste. 354
Tyler, Texas 75702

Re:  No. 12-15-00287-CV
    Blue Cross and Blue Shield of Texas, a Division of Health Care
    Service Corporation vs. East Texas Medical Center

Dear Ms. Estes:

This notice is exceptional because this threatened request for an emergency stay is exceptional in that it implicates the newly-won opportunity for health care choice for 30,000 Smith County residents who are in the BlueChoice PPO network which is the subject of the complained of temporary injunction issued by the Honorable Jack Skeen, presiding judge of Smith County's 241st District Court. On November 10, 2015, East Texas Medical Center secured a temporary injunction from the Honorable Jack Skeen, Jr., of the 241st District Court of Smith Count requiring that BlueCross BlueShield of Texas include East Texas Medical Center-Tyler in its BlueChoice PPO network pending a November, 2016, trial. BlueCross &BlueShield of Texas complied with the Court's order and one week later began listing ETMC-Tyler as an in network provider on its web site describing ETMC-Tyler as "generally more affordable" than its peers. This web page screen shot was made part of the record by Court order dated 11/30/15 and is attached to this notice for reference. Since 11/16/2015, ETMC-Tyler has treated 492 BlueCross PPO member patients who before the temporary injunction could not have received treatment on an in-network basis. As of 12/1/15, another 181 BlueCross PPO patients have pending procedures scheduled in the future at ETMC-Tyler on an in-network basis.

BCBS appealed the temporary injunction on the last possible day (11/30/15) and announced to ETMC's counsel today (12/1/15) of its intention to seek an emergency stay of the temporary injunction. ETMC wishes to bring this to the attention of your Honors to emphasize the risk to BlueChoice patients now awaiting newly scheduled procedures at ETMC-Tyler should this Court summarily stay the effect of the injunction. Instead, ETMC-respectfully requests that it be given an opportunity to detail its opposition before any such request is acted upon so this Court may avoid causing unknown and unintended hardship on these patients.

Ms. Pam Estes
December 1, 2015
Page 2

Respectfully,

Otis Carroll
For the Firm

OC:nc

Find a Doctor or Hospital - Blue Cross Blue Shield of Texas - Internet Explorer

finder/search-results.do?contentId=TXISGnextPage= | G bcbstx - Google Search | Find a Doctor or Hospital - Blu... | Find a Doctor or Hospital - Blu... | Find a Doctor or Hospital - ... ×

**BlueCross BlueShield**
of Texas

**Provider Finder**
Last Updated:11/17/2015

Search | FAQs | Company Information | Disclaimer | en Español

**Searched By:**

**Name:** east texas medical center

**Location:** Tyler

**State:** TX

**Travel Distance** 15 Miles

**Network:** Blue Choice PPO℠

**Back to Results**

Email this page   Send to my phone   Print this page

 Provide Corrections or updates to provider information such as the provider's contract status or whether the provider is accepting new patients.

### East Texas Medical Center

**Address:** 1000 South Beckham Street
Tyler, TX 75701

**Phone:** (903)597-0351

**NPI:** 1235256884

Physician/Hospital Information Validation

**BlueCompare** (What is Bluecompare?)



Affordability

Less   Avg.   More

The cost of inpatient and outpatient care provided by this general acute care hospital is somewhat more affordable compared to peers.

**Recognition/Certification/Accreditation (s):**

**In-Network Options:**

Searching for specialty pharmacy, independent clinical laboratory, or durable medical equipment providers? Learn more about your in-network options

**Network Information**

This provider is part of the medical group(s) and networks shown here. You will also find other details such as where to find this provider, hospitals where this provider can treat patients, specialties, and more. Select a network below to view more information.

**Blue Advantage** ℠

**Start a New Search:**

Return to the home page and start a new search

**Blue Choice PPO**℠

**Plans Accepted on this Network**

View plans in this network         ✓ Accepting Patients

**Provider Specialty:** General Acute Care Hospital

MOTION
EXHIBIT 1

index.htm

# TAB 3

CAUSE NO. 15-1165

| | | |
|---|---|---|
| EAST TEXAS MEDICAL CENTER, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 241st JUDICIAL DISTRICT |
| | § | |
| BLUE CROSS & BLUE SHIELD OF TEXAS, | § | |
| a Division of HEALTH CARE SERVICE | § | |
| CORPORATION, AETNA HEALTH, INC., | § | |
| AETNA LIFE INSURANCE COMPANY, | § | |
| CIGNA HEALTHCARE OF TEXAS, INC., | § | |
| and CIGNA HEALTH AND LIFE | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Defendants. | § | SMITH COUNTY TEXAS |

PLAINTIFF'S FIRST AMENDED PETITION AND
APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF

Plaintiff, East Texas Medical Center ("ETMC"), files this First Amended Petition and

Application for Temporary Injunctive Relief. Defendants are Blue Cross & Blue Shield of Texas

("Blue Cross"), a Division of Health Care Service Corporation ("HCSC"), Aetna Health, Inc.

("Aetna"), Aetna Life Insurance Co. ("ALI"), Cigna Healthcare of Texas, Inc. ("Cigna"), and

Cigna Health and Life Insurance ("CHLI"), and Plaintiff alleges as follows.

## I.   DISCOVERY CONTROL PLAN AND JURISDICTION

1.     ETMC requests that the Court enter a Discovery Control Plan tailored to the

circumstances of this case. See Tex. R. Civ. P. 190.4. Discovery Control Plan Level 3 applies. Id.

The damages sought are within the jurisdictional limits of the Court, as ETMC seeks, inter alia,

monetary relief over $1,000,000.00. See Tex. R. Civ. P. 47(b), (c)(5).

## II.   NATURE OF THE CASE

2.     ETMC asserts claims against Blue Cross, Aetna, and Cigna for (i) common law

negligence, (ii) interference with prospective business relations and economic advantage, (iii)

1

violations of sections 1301.006(a) and 1301.051 (a) and (b) of the Texas Insurance Code, and (iv) temporary injunctive relief. Because the challenged conduct was undertaken willfully and maliciously, and/or constitutes gross negligence, ETMC is entitled to, inter alia, both compensatory and exemplary damages. ETMC reserves the right to assert further claims, both statutory and common law, and/or additional facts demonstrating concerted action by the defendants, as discovery warrants.

### III. PARTIES

3. ETMC is a charitable not-for-profit acute care community hospital incorporated under the laws of the State of Texas and located in Tyler, Texas.

4. Blue Cross is an unincorporated division of HCSC, an Illinois Mutual Legal Reserve Company with its principal place of business in Chicago, Illinois. Subject to a motion to sever, Blue Cross and HCSC have answered and otherwise appeared. As the owner of an unincorporated division, HCSC is liable for Blue Cross' challenged conduct.

5. Aetna is a Texas corporation. Subject to motions to sever and transfer venue, Aetna has answered and otherwise appeared.

6. ALI is a foreign corporation with its principal place of business in Hartford, Connecticut. Subject to motions to sever and transfer venue, ALI has answered and otherwise appeared. Upon information and belief, ALI is the corporate parent or an affiliate of Aetna. Except as noted below, "Aetna" refers to Aetna and ALI collectively.

7. Cigna is a Texas corporation. Subject to a motion to sever, Cigna has answered and otherwise appeared.

8. CHLI is a foreign corporation with its principal place of business in Bloomfield, Connecticut. Subject to a motion to sever, CHLI has answered and otherwise appeared. Upon

2

information and belief, CHLI is the corporate parent or an affiliate of Cigna. Except as noted below, "Cigna" refers to Cigna and CHLI collectively.

## IV. VENUE

9. Venue is proper in Smith County because all or a substantial part of the events or omissions giving rise to ETMC's claims occurred in Smith County. See Tex. Civ. Prac. & Rem. Code § 15.002(a)(1).

## V. FACTS

10. ETMC is a full service hospital serving Tyler, Smith County, and other parts of East Texas. It has the only Level 1 trauma center in East Texas, and is the only hospital in East Texas providing renal transplants and deep brain stimulation. The closest Level 1 trauma center is at least 100 miles away in Dallas, Texas. Likewise, the closest facilities providing renal transplants and deep brain stimulation are located in Dallas. Further, ETMC is one of only two hospitals in Smith County that provides inpatient psychiatric services, and the only hospital in East Texas that provides inpatient psychiatric services for children and adolescents.

11. Blue Cross, Aetna, and Cigna are commercial insurance companies that sell, inter alia, health insurance policies in the private insurance market in Texas. One product offered by each is a preferred provider benefit plan ("PPO"). A PPO is "a benefit plan in which an insurer provides, through its health insurance policy, for the payment of a level of coverage that is different from the basic level of coverage provided by the health insurance policy if the insured person uses a preferred provider." Tex. Ins. Code § 1301.001(9) (emphasis added).

12. Blue Cross is the largest health insurer in Texas and Smith County. Blue Cross offers two preferred provider benefit plans (collectively, "Blue Cross PPO") which, upon information and belief, comprise well over half of the PPO market in Smith County.

3

13. Aetna offers a preferred provider benefit plan ("Aetna PPO") which, upon information and belief, comprises approximately 16% of the PPO market in Smith County. According to Aetna's website, ALI appears to be the entity that markets the Aetna PPO to consumers and holds the license to offer the Aetna PPO. Upon information and belief, Aetna is the entity that actually enters into, and issues, delivers, or issues for delivery, contracts concerning the Aetna PPO in Texas. As a result, both ALI and Aetna are performing functions regulated by Texas Insurance Code Chapter 1301, and each is liable for the challenged conduct described below. Again, therefore, unless the context requires otherwise, we hereinafter refer to both ALI and Aetna as "Aetna."

14. Cigna offers a preferred provider benefit plan ("Cigna PPO") which, upon information and belief, comprises most of the PPO market in Smith County not controlled by Blue Cross and Aetna. According to Cigna's website, CHLI appears to be the entity that markets the Cigna PPO to consumers and holds the license to offer the Cigna PPO. Upon information and belief, Cigna is an entity that actually enters into, and issues, delivers, or issues for delivery, contracts concerning the Cigna PPO. As a result, both CHLI and Cigna are performing functions regulated by Texas Insurance Code Chapter 1301, and each is liable for the challenged conduct described below. Accordingly, unless the context requires otherwise, we hereinafter refer to both CHLI and Cigna as "Cigna."

15. Upon information and belief, Blue Cross, Aetna, and Cigna together control more than 90 % of the PPO market in Smith County.

16. A preferred provider is, inter alia, a "health care provider" (e.g., a hospital) "who contracts with an insurer to provide medical care or health care to insureds covered by a health insurance policy." Tex. Ins. Code § 1301.001(8). The amalgam of preferred providers under a particular health care plan is known as a "network." Hospitals such as ETMC are admitted to a

4

network through contracts entered into with the insurer, whereby the hospitals offer negotiated rates for services to the insurer. With respect to a given PPO, a hospital is either "in-network," or "out-of-network."

17. Insurers must give "institutional providers," among others, "a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider...." Tex. Ins. Code § 1301.051(a). Further, they "may not unreasonably withhold a designation as a preferred provider." Tex. Ins. Code § 1301.051(b). As a hospital, ETMC is an institutional provider. See Tex. Ins. Code § 1301.01(1-a; 4). It is, therefore, entitled to a "fair, reasonable, and equivalent" opportunity to be designated as a preferred provider in the Blue Cross PPO, the Aetna PPO, and the Cigna PPO, and such designations cannot be unreasonably withheld.

18. Further, an insurer that markets a PPO shall contract with health care providers "to ensure that all medical and health care services and items contained in the package of benefits for which coverage is provided, including treatment of illnesses and injuries, will be provided under the health insurance policy in a manner ensuring availability of and accessibility to adequate personnel, specialty care, and facilities." Tex. Ins. Code § 1301.006(a) (emphasis added). Thus, if a medical or health care item or service is covered by a PPO, then the insurer must contract with health care providers in a manner that ensures availability and accessibility of that item or service to the insured members of the PPO. By way of example, if the Blue Cross PPO, the Aetna PPO, or the Cigna PPO covers renal transplants, then Blue Cross, Aetna, and Cigna, respectively, must contract with physicians and hospitals in a manner that ensures availability and accessibility of renal transplants to their insureds. Likewise, the same is true with respect to deep brain stimulation and inpatient psychiatric services for children and adolescents. And perhaps most importantly, Blue Cross, Aetna, and Cigna must contract with hospitals in a manner that ensures availability and accessibility to their insureds of level 1 trauma care. As set forth above, ETMC is the only

5

provider of each of these services in East Texas, and the next closest provider is more than 100 miles away in Dallas.

19. Blue Cross has refused, and continues to refuse, to admit ETMC as an in-network preferred provider in the Blue Cross PPO. Aetna has refused, and continues to refuse, to admit ETMC as an in-network preferred provider in the Aetna PPO. Cigna has refused, and continues to refuse, to admit ETMC as an in-network preferred provider in the Cigna PPO. Specifically, each has denied ETMC's requests to participate as a preferred provider and has not offered ETMC the opportunity to participate at negotiated rates. Upon information and belief, ETMC's involuntary exclusion is unique in the State of Texas in terms of its treatment by Blue Cross, Aetna, and Cigna. For example, there are 271 not-for-profit charitable hospitals in Texas. ETMC is the only acute care community hospital involuntarily excluded from the Blue Cross PPO.[1] The Aetna and Cigna PPOs are similarly inclusive of hospitals comparable to ETMC.[2]

20. The parallel treatment of ETMC by Blue Cross, Aetna, and Cigna gives rise to a strong inference of concerted action. In other words, the fact that ETMC--the second largest hospital and only provider of various services in East Texas--is uniquely excluded from (or nearly so) the defendants' PPOs is evidence of an agreement between (at least) Blue Cross, Aetna, and Cigna to exclude ETMC from the PPO market in Smith County. The inference of collusion is all the more compelling given that, without ETMC in their respective PPOs, Blue Cross, Aetna, and Cigna cannot provide their insureds with ready access to the services provided exclusively by ETMC in Smith County (e.g., a level 1 trauma center).

---

[1] Of the other six not-for-profit hospitals not in the Blue Cross PPO, only one is a non-specialty hospital comparable to ETMC and, upon information and belief, that hospital terminated its Blue Cross PPO during rate negotiations.

[2] Several of the hospitals not in the Aetna and Cigna PPOs are specialty hospitals not comparable to ETMC. Only a handful of comparable hospitals are involuntarily excluded by Aetna or Cigna.

6

21.     Apart from ETMC, there are two other non-specialty acute care hospitals in Smith County. Blue Cross has admitted both hospitals as in-network preferred providers in the Blue Cross PPO. Aetna has admitted both hospitals as in-network preferred providers in the Aetna PPO. Cigna has admitted both hospitals as in-network preferred providers in the Cigna PPO.

22.     As noted above, hospitals admitted to the Blue Cross PPO, the Aetna PPO, and the Cigna PPO, are in-network preferred providers. Hospitals not admitted are out-of-network providers. Insurers treat in-network preferred providers and out-of-network providers differently vis-a-vis insureds' benefit levels. Generally, it costs patients significantly more to use out-of-network providers because (i) out-of-network deductibles and co-payments are much higher, and (ii) in-network expenditures do not count toward meeting those higher amounts. Likewise, insureds can in some cases be subject to meeting dual-track deductibles for in-network and out-of-network services, again resulting in significantly higher costs to the insured for using an out-of-network provider. Thus, it is far better financially for insureds to use in-network providers than out-of network providers. That payment or reimbursement structure is designed and intended by Blue Cross, Aetna, and Cigna to steer insureds away from out-of-network providers.     23.

With its exclusion from the Blue Cross PPO, the Aetna PPO, and the Cigna PPO, ETMC is at a significant competitive disadvantage in seeking to provide hospital services to persons insured thereunder. The reason is not difficult to grasp: those patients are intentionally steered away from ETMC to in-network providers, and the financial disincentive for insureds to go out-of-network is too great for most people to overcome. The effect is exacerbated by the fact that the Blue Cross PPO, the Aetna PPO, and the Cigna PPO are by far the dominant forms of private health care insurance in Smith County. The result is that while ETMC is one of the largest hospitals

7

in the area, it is largely excluded from providing hospital health care services to privately insured patients in its services areas, i.e., Tyler, Smith County, and East Texas.[3]

24.     Further, ETMC's exclusion as an in-network preferred provider also wrongfully conveys to the public that Blue Cross, Aetna, and Cigna view it as inadequate as a health care provider. The public is left to wonder whether the insurers' refusals to give ETMC their "stamp of approval" as an in-network provider mean that the quality of care delivered by ETMC is problematic (which it unequivocally is not and has never been). The stigma created by the exclusions impacts ETMC's reputation and negatively influences patients who might use it as their hospital of choice. The harm to ETMC's reputation caused by its exclusion from the Blue Cross PPO, the Aetna PPO, and the Cigna PPO is cumulative and indivisible. Moreover, that harm is exacerbated by the combined market power of the defendants in Smith County.

25.     There is no legitimate basis for ETMC's exclusion from the Blue Cross, Aetna, and Cigna PPOs. Blue Cross' refusal to admit ETMC as an in-network provider in the Blue Cross PPO is unreasonable. Aetna's refusal to admit ETMC as an in-network provider in the Aetna PPO is unreasonable. Cigna's refusal to admit ETMC as an in-network preferred provider in the Cigna PPO is unreasonable. In each case, ETMC's exclusion is all the more unreasonable given that ETMC is the exclusive provider in East Texas of services which, upon information and belief, are covered by the Blue Cross PPO, the Aetna PPO, and the Cigna PPO. Because ETMC is out-of-network, those services are not accessible to the PPOs' insureds.

---

[3] In a PPO model, plan members are incentivized (or, in some cases, required) to use a network of health care providers that have contracted with the insurer to provide services under reduced rates or other favorable terms. In exchange for agreeing to such terms, in-network providers obtain "a competitive advantage over any out-of-network rivals in that plan members are steered to in-network providers by the plan's restrictions or incentives." Good Shepherd Med. Center, Inc. v. State of Texas, 306 S.W. 3d 825, 828-29 (Tex. App. – Austin 2010, no pet.).

8

26. ETMC has approached Blue Cross seeking admission to the Blue Cross PPO, but those efforts have proven futile. Most recently, a request to be admitted was made in a meeting held on December 19, 2014 in Dallas, Texas. At the meeting, ETMC again requested that it be admitted to the Blue Cross PPO as an in-network preferred provider. Even with the filing of this lawsuit, (i) Blue Cross has made no substantive response to the request, and (ii) ETMC has not been admitted to the Blue Cross PPO.

27. As the dominant buyer of privately funded hospital health care services in Smith County, Blue Cross has market power in the private health insurance market. The exclusion of ETMC as an in-network preferred provider in the Blue Cross PPO injures competition in the market and harms consumers by effectively reducing access to quality health. The effect of ETMC's exclusion is all the more pronounced for patients in need of Level 1 trauma care, renal transplants, certain in-patient psychiatric services, or deep brain stimulation. Those in need of such services are denied local in-network access to the only provider thereof, i.e., ETMC.

28. Historically, Aetna has taken the position that, as long as "exclusivity" exists in the Tyler market, ETMC cannot participate in the Aetna PPO. Except as required by state law for health insurance provided by the Teacher Retirement System of Texas ("TRS"), Aetna continues to enforce this ban. TRS is required to provide (or contract to provide) for its members a health care plan that makes in-network status available to any general hospital in a defined geographic area that agrees to the same terms and conditions as other hospital providers under the plan. See Tex. Ins. Code Ann. §§ 1575.163; 1579.108; Good Shepherd Med. Center, Inc. v. State of Texas, supra, at 828-29. ETMC qualifies as a provider that must be included in-network in a health care insurance plan provided by TRS. Currently, TRS provides its members health care coverage through Aetna. Accordingly, as required under Texas law, ETMC is in-network in the Aetna PPO

9

for TRS members. Otherwise, it is out-of-network.[4] In other words, Aetna continues to refuse to admit ETMC as an in-network preferred provider in the Aetna PPO generally.

29. Aetna's invocation of "exclusivity" in the Tyler market as a basis for excluding ETMC from the Aetna PPO further gives rise to a strong inference that Blue Cross, Aetna, and Cigna have acted--and are acting--in concert with respect to ETMC's exclusion from the PPO market in Smith County. In other words, "exclusivity" exists only because Blue Cross, Aetna, and Cigna exclude ETMC from their respective PPOs.

30. Cigna's exclusion of ETMC from in-network status in the Cigna PPO is made all the more unreasonable by the historical context in which it occurs. In 2007, Cigna acquired Great-West Healthcare of Texas ("GW"). ETMC was an in-network preferred provider in GW's preferred provider plan. After acquiring GW, Cigna continued that treatment until February 2013, when it abruptly--and without explanation or cause--terminated ETMC as an in-network provider. Since then, it has excluded ETMC as a preferred provider in the Cigna PPO.

31. Blue Cross, Aetna, and Cigna are fully aware of the requirements of § 1301.051, which apply not only to hospitals and other institutional providers, but also to doctors and practitioners of other sorts. Likewise, they are aware of the requirements of § 1301.006(a), which mandate that covered services be available and accessible. Further, they are aware that ETMC is the flagship hospital in the East Texas Medical Center Regional Healthcare System ("System"), a charitable not-for-profit corporation comprised of and offering primary, secondary, and tertiary healthcare facilities and services in locations throughout Smith County and East Texas. Finally, they know that steering patients away from ETMC interferes with ETMC's prospective business

---

[4] Blue Cross was TRS's health insurer before Aetna and included ETMC in the Blue Cross PPO for TRS members. Otherwise, it excluded ETMC as an in-network preferred provider generally.

10

relations and economic advantage, which further undermines both ETMC's status as the System's flagship hospital and the System's overall goals.

32. Specifically, the System's mission is to provide the people of East Texas with access to high quality health care. To that end, it maintains, inter alia, forty clinics and twelve hospitals serving thirty-nine counties in the greater East Texas area. ETMC is the System's largest hospital, and serves as the hub of the System's hub-and-spoke operations. Whenever possible, healthcare services are provided in, or near, a patient's home location. Thus, the System is organized to provide primary care in rural health clinics, secondary care in its eleven outlying hospitals, and tertiary care at ETMC.

33. All of the System's outlying hospitals are admitted in the Blue Cross PPO. Similarly, all but one of the System's outlying hospitals are admitted in the Aetna and Cigna PPOs. Thus, (i) with one exception, the System's affiliated hospitals are in-network preferred providers in the PPOs, but (ii) the flagship hospital, ETMC, is out-of-network. This means that member-patients of the PPOs may use the System's affiliated hospitals as in-network preferred providers, but generally may use ETMC only as an out-of-network provider. The exclusion of ETMC from the PPOs impedes and interferes with the System's ability to provide the people of East Texas with seamless access to high quality health care. Members of the PPOs can obtain primary and/or secondary treatment at the System's affiliated hospitals as preferred providers, but when referred to ETMC for tertiary treatment must elect to (i) receive that treatment on an out-of-network basis that is more expensive because of increased deductibles and co-payments, or (ii) go to an in-network provider not for medically-indicated reasons, but for better insurance coverage. In this way, among others, Blue Cross, Aetna, and Cigna knowingly and intentionally interfere with both ETMC's prospective economic advantage, and the System's mission. Indeed, by interfering with the clinical integration of services, the exclusion of ETMC from the Blue Cross, Aetna, and Cigna

11

PPOs undermines the goal of optimizing the efficacy of patient care. That the System's outlying hospitals are allowed to participate in the Blue Cross, Aetna, and Cigna PPOs further underscores the unreasonableness of ETMC's exclusion. And this is all the more so with respect to services that are available only at ETMC.

## VI. COUNT I
### (Common Law Negligence)

34. Paragraphs 1-33 of this First Amended Petition and Application for Temporary Injunctive Relief are incorporated by reference as if set forth in full herein.

35. Blue Cross, Aetna, and Cigna have a duty to ETMC to afford it a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Blue Cross PPO, the Aetna PPO, and the Cigna PPO, respectively ("Duty # 1").

36. Blue Cross, Aetna, and Cigna have a duty to ETMC not to unreasonably exclude ETMC from the Blue Cross PPO, the Aetna PPO, and the Cigna PPO, respectively ("Duty # 2").

37. Blue Cross has breached, and continues to breach, Duty # 1 by failing to afford ETMC a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Blue Cross PPO.

38. Blue Cross has breached, and continues to breach, Duty # 2 by unreasonably withholding from ETMC designation as a preferred provider in the Blue Cross PPO. ETMC's exclusion from the Blue Cross PPO is made all the more unreasonable by Blue Cross' failure to comply with the requirements of § 1301.006(a).

39. Aetna has breached, and continues to breach, Duty # 1 by failing to afford ETMC a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Aetna PPO.

12

40. Aetna has breached, and continues to breach, Duty # 2 by unreasonably withholding from ETMC designation as a preferred provider in the Aetna PPO. ETMC's exclusion from the Aetna PPO is made all the more unreasonable by Aetna's failure to comply with the requirements of § 1301.006(a).

41. Cigna has breached, and continues to breach, Duty # 1 by failing to afford ETMC a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Cigna PPO.

42. Cigna has breached, and continues to breach, Duty # 2 by unreasonably withholding from ETMC designation as a preferred provider in the Cigna PPO. ETMC's exclusion from the Cigna PPO is made all the more unreasonable by Cigna's failure to comply with the requirements of § 1301.006(a).

43. Blue Cross' breaches of Duty # 1 and Duty # 2 are the proximate cause of harm to ETMC. ETMC is entitled to, and should be awarded, actual damages for those breaches.

44. Aetna's breaches of Duty # 1 and Duty # 2 are the proximate cause of harm to ETMC. ETMC is entitled to, and should be awarded, actual damages for those breaches.

45. Cigna's breaches of Duty # 1 and Duty # 2 are the proximate cause of harm to ETMC. ETMC is entitled to, and should be awarded, actual damages for those breaches.

46. ETMC has suffered substantial loss of goodwill and damages to its reputation as a combined and indivisible result of (i) Blue Cross' negligence, (ii) Aetna's negligence, and (iii) Cigna's negligence. These damages were proximately caused by and a foreseeable result of the defendants' breaches of the duties owed to ETMC. ETMC seeks recover of these damages and any other damages resulting from the defendants' wrongful conduct.

## VII.   COUNT II
(Interference with Prospective Business Relations and Economic Advantage)

13

47. Paragraphs 1-33 of this First Amended Petition and Application for Temporary Injunctive Relief are incorporated by reference as if set forth in full herein.

48. By excluding ETMC from the Blue Cross PPO, Blue Cross has intentionally interfered, and continues to intentionally interfere, with ETMC's prospective business relations and economic advantage. But for that exclusion, there is a reasonable probability that ETMC would have entered into business relationships with third parties, to wit: (i) insureds under the PPO referred from the System's other hospitals, and (ii) other insureds under the PPO who would have selected ETMC as their hospital of choice for in-patient or out-patient services. At a minimum, Blue Cross knew that excluding ETMC from the Blue Cross PPO would mean that its insureds would not--because they financially could not--elect to go to ETMC. Blue Cross' conduct was independently tortious and unlawful because it is inconsistent with the standard of care set forth in § 1301.051.

49. By excluding ETMC from the Aetna PPO, Aetna has intentionally interfered, and continues to intentionally interfere, with ETMC's prospective business relations and economic advantage. But for that exclusion, there is a reasonable probability that ETMC would have entered into business relationships with third parties, to wit: (i) insureds under the PPO referred from the System's other hospitals, and (ii) other insureds under the PPO who would have selected ETMC as their hospital of choice for in-patient or out-patient services. At a minimum, Aetna knew that excluding ETMC from the Aetna PPO would mean that its insureds would not--because they financially could not--elect to go to ETMC. Aetna's conduct was independently tortious and unlawful because it is inconsistent with the standard of care set forth in § 1301.051.

50. By excluding ETMC from the Cigna PPO, Cigna has intentionally interfered, and continues to intentionally interfere, with ETMC's prospective business relations and economic advantage. But for that exclusion, there is a reasonable probability that ETMC would have entered

14

into business relationships with third parties, to wit: (i) insureds under the PPO referred from the System's other hospitals, and (ii) other insureds under the PPO who would have selected ETMC as their hospital of choice for in-patient or out-patient services. At a minimum, Cigna knew that excluding ETMC from the Cigna PPO would mean that its insureds would not--because they financially could not--elect to go to ETMC. Cigna's conduct was independently tortious and unlawful because it is inconsistent with the standard of care set forth in § 1301.051.

51.     Blue Cross' interference is the proximate cause of injury to ETMC, and ETMC suffered actual damage or loss as a result. Accordingly, ETMC is entitled to, and should be awarded, actual damages.

52.     Aetna's interference is the proximate cause of injury to ETMC, and ETMC suffered actual damage or loss as a result. Accordingly, ETMC is entitled to, and should be awarded, actual damages.

53.     Cigna's interference is the proximate cause of injury to ETMC, and ETMC suffered actual damage or loss as a result. Accordingly, ETMC is entitled to, and should be awarded, actual damages.

54.     ETMC has suffered substantial loss of goodwill and damages to its reputation as a combined and indivisible result of (i) Blue Cross' interference (ii) Aetna's interference, and (iii) Cigna's interference. These damages were proximately caused by and a foreseeable result of the defendants' breaches of the duties owed to ETMC. ETMC seeks recover of these damages and any other damages resulting from the defendants' wrongful conduct.

## VIII.   COUNT III
### (Violations of Tex. Ins. Code §§ 1301.006(a) and 1301.051)

55.     Paragraphs 1-33 of this First Amended Petition and Application for Temporary Injunctive Relief are incorporated by reference as if set forth in full herein.

15

56. Blue Cross has violated, and continues to violate, § 1301.051(a) by failing to afford ETMC a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Blue Cross PPO.

57. Blue Cross has violated, and continues to violate, § 1301.051(b) by unreasonably withholding from ETMC designation as a preferred provider in the Blue Cross PPO.

58. Blue Cross has violated, and continues to violate, § 1301.006(a) by failing to contract with ETMC as an in-network preferred provider in the Blue Cross PPO.

59. ETMC has been damaged, and will continue to be damaged, by Blue Cross' violations of §§ 1301.006(a) and 1301.051. ETMC is entitled to, and should be awarded, money damages for those violations.

60. Aetna has violated, and continues to violate, § 1301.051(a) by failing to afford ETMC a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Aetna PPO.

61. Aetna has violated, and continues to violate, § 1301.051(b) by unreasonably withholding from ETMC designation as a preferred provider in the Aetna PPO.

62. Aetna has violated, and continues to violate, § 1301.006(a) by failing to contract with ETMC as an in-network preferred provider in the Aetna PPO.

63. ETMC has been damaged, and will continue to be damaged, by Aetna's violations of §§ 1301.006(a) and 1301.051. ETMC is entitled to, and should be awarded, money damages for those violations.

64. Cigna has violated, and continues to violate, § 1301.051(a) by failing to afford ETMC a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider in the Cigna PPO.

16

65.    Cigna has violated, and continues to violate, § 1301.051(b) by unreasonably withholding from ETMC designation as a preferred provider in the Cigna PPO.

66.    Cigna has violated, and continues to violate, § 1301.006(a) by failing to contract with ETMC as an in-network preferred provider in the Cigna PPO.

67.    ETMC has been damaged, and will continue to be damaged, by Cigna's violations of §§ 1301.006(a) and 1301.051. ETMC is entitled to, and should be awarded, money damages for those violations.

## IX.    COUNT IV
(Action for Punitive Damages)

68.    Paragraphs 1-67 of this First Amended Petition and Application for Temporary Injunctive Relief are incorporated by reference as if set forth in full herein.

69.    Blue Cross' challenged conduct was undertaken with malice, i.e., with a specific intent to cause substantial injury or harm to ETMC. In addition, or alternatively, Blue Cross' challenged conduct constitutes gross negligence within the meaning of Tex. Civ. Prac. and Rem. Code § 41.001(11). Further, in addition to violating the duties set forth in Counts I and II, supra, Blue Cross has knowingly and willfully violated § 1301.006(a)'s requirement that "[a]n insurer that markets a preferred provider benefit plan shall contract with physicians and health care providers to ensure that all medical and health care services and items contained in the package of benefits for which coverage is provided, including treatment of illnesses and injuries, will be provided under the health insurance policy in a manner ensuring availability of and accessibility to adequate personnel, specialty care, and facilities." Blue Cross's conduct in ignoring the laws of the State of Texas is proof of its total disregard for its legal obligations. ETMC is therefore entitled to, and should be awarded exemplary damages against Blue Cross.

17

70. Aetna's challenged conduct was undertaken with malice, i.e., with a specific intent to cause substantial injury or harm to ETMC. In addition, or alternatively, Aetna's challenged conduct constitutes gross negligence within the meaning of Tex. Civ. Prac. and Rem. Code § 41.001(11). Further, in addition to violating the duties set forth in Counts I and II, supra, Aetna has knowingly and willfully violated § 1301.006(a)'s requirement that "[a]n insurer that markets a preferred provider benefit plan shall contract with physicians and health care providers to ensure that all medical and health care services and items contained in the package of benefits for which coverage is provided, including treatment of illnesses and injuries, will be provided under the health insurance policy in a manner ensuring availability of and accessibility to adequate personnel, specialty care, and facilities." Aetna's conduct in ignoring the laws of the State of Texas is proof of its total disregard for its legal obligations. ETMC is therefore entitled to, and should be awarded exemplary damages against Aetna.

71. Cigna's challenged conduct was undertaken with malice, i.e., with a specific intent to cause substantial injury or harm to ETMC. In addition, or alternatively, Cigna's challenged conduct constitutes gross negligence within the meaning of Tex. Civ. Prac. and Rem. Code § 41.001(11). Further, in addition to violating the duties set forth in Counts I and II, supra, Cigna has knowingly and willfully violated § 1301.006(a)'s requirement that "[a]n insurer that markets a preferred provider benefit plan shall contract with physicians and health care providers to ensure that all medical and health care services and items contained in the package of benefits for which coverage is provided, including treatment of illnesses and injuries, will be provided under the health insurance policy in a manner ensuring availability of and accessibility to adequate personnel, specialty care, and facilities." Cigna's conduct in ignoring the laws of the State of Texas is proof of its total disregard for its legal obligations. ETMC is therefore entitled to, and should be awarded exemplary damages against Cigna.

18

## X. COUNT IV
### (Action for Temporary Injunction against Blue Cross)

72.     Paragraphs 1-71 of this First Amended Petition and Application for Temporary Injunctive Relief are incorporated by reference as if set forth in full herein.

73.     The Affidavit of Stephen P. Rydzak, M.D. ("Rydzak Aff.") is annexed hereto in support of ETMC's application for temporary injunctive relief and is incorporated herein for all purposes.

74.     ETMC has stated claims against Blue Cross as set forth above. ETMC has a probable right to relief on those claims because, inter alia, (i) it has not been given a fair, reasonable, and equivalent opportunity to be designated as a preferred provider in the Blue Cross PPO, and (ii) it has been and continues to be unreasonably excluded from the Blue Cross's PPO.

75.     In the absence of temporary injunctive relief pending trial and judgment in this case, ETMC faces a probable, imminent, and irreparable injury. As explained above, Blue Cross accounts for more than 73% of the PPO market in Smith County. The PPO market, in turn, is by far the most common form of private health insurance in East Texas. Thus, ETMC's exclusion from the Blue Cross PPO leaves it out-of-network for the vast majority of privately-insured patients. The exclusion of ETMC from the PPO networks means that physicians cannot use ETMC as a treatment option for their patients because of the prohibitive financial penalty that such a decision imposes on those patients, even when the physicians believe that ETMC would provide the optimum integration of clinical services and continuity of care for their patients. The inability to refer patients to ETMC due to Blue Cross's wrongful exclusion of ETMC from its PPO networks has a direct and debilitating effect on the physicians and patients in this community and on ETMC. See Rydzak Aff.

19

76. Since the implementation of the Affordable Care Act in 2010, Blue Cross has dramatically increased the differential between payments for in-network services and payments for out-of-network services. In other words, the penalty imposed on insureds for using out-of-network providers is now much more costly than historically was the case. The result is that fewer and fewer patients can, and will, choose out-of-network providers such as ETMC. Without immediate access to privately-insured patients such as insureds under the Blue Cross's PPO, ETMC has now begun to lose money on its hospital operations. The grim reality is that, unless those losses are reversed and ETMC is able to make a profit, it will be unable to remain in business. Without ETMC's unique services and its capacity to address the healthcare needs of the citizens of this area, patients will not be able to obtain the care that they need. The injury that ETMC will suffer if forced to go out of business is more than probable. Indeed, it is certain. That injury is also imminent and, unless granted injunctive relief, ETMC will not survive through trial of this matter. See Rydzak Aff. The injury will be irreparable in two interrelated ways. First, the injury to ETMC if it is forced out of business cannot be compensated in damages or measured by a certain pecuniary standard. Second, the injury to the community from ETMC's demise would be grave and incalculable. See Rydzak Aff.

77. Additionally, by reason of the facts set forth herein and the Rydzak Aff. attached hereto, ETMC has shown and will show further that it is likely to prevail on the merits in proving that BCBS has and is illegally excluding ETMC from its PPO networks.

78. The facts demonstrate that ETMC has no adequate remedy at law and is entitled to injunctive relief. The present illegal status quo is a result of Blue Cross's continued violations of its statutory duties as set forth herein. Blue Cross's illegal action has caused irreparable harm to ETMC and a certain class of members of the public and such illegal action constitutes a continuing threat of irreparable harm to ETMC and to certain members of the public as set forth in detail

20

above and in the Rydzak Aff. For every medical doctor similarly situated to doctor Dr. Rydzak, the illegal conduct of Blue Cross presents a continuing threat of irreparable harm to ETMC and those members of the public who wish to have a doctor-patient relationship with any doctors similarly situated. This continued threat of irreparable harm to ETMC and this identified class of members of the public by reason of the illegal conduct of Blue Cross can only be remedied by the issuance of an injunction as requested herein. The issuance of such an injunction will cause no harm to Blue Cross and a balancing of the equities weighs heavily in favor of ETMC. Such injunction is necessary to enforce the public policy of the State of Texas as declared in the statutes identified above that Blue Cross is willfully and knowingly violating.

79.     The issuance of a temporary injunction is necessary to establish a legal status quo between ETMC and Blue Cross that is free from Blue Cross's illegal actions, this Court must order Blue Cross to cease such illegal conduct by ORDERING Blue Cross to do the following:

(i)     cease and desist from excluding ETMC from its networks and interfering in doctor-patient relationships by allowing ETMC's immediate and full participation in Blue Cross's Blue Options and Blue Choice PPO networks, at rates identical to those in force in the Hospital Agreement for Traditional Indemnity Business in effect between ETMC and Blue Cross (effective on 8/15/2012 and amended effective 9/15/2015) until new PPO agreements are negotiated and signed;

(ii)     cease and desist from excluding ETMC from its provider directories by listing ETMC as an in-network provider; and

(iii) cease and desist from restricting ETMC's right and ability to market itself as an in-network provider in Blue Cross's Blue Options and Blue Choice PPO networks.

21

80.     Unless BCBS is restrained from its continued unlawful exclusion of ETMC from the PPO networks, ETMC will no longer be able to maintain its operations and will suffer immediate and irreparable harm. See Rydzak Aff.

## XII.    PRAYER FOR RELIEF

WHEREFORE, ETMC respectfully requests that Blue Cross, Aetna, and Cigna be cited to appear and, upon final hearing, the Court enter judgment:

(i)     granting ETMC temporary injunctive relief against Blue Cross;

(ii)    awarding ETMC damages against Blue Cross for breach of its duties to ETMC;

(iii)   awarding ETMC damages against Aetna for breach of its duties to ETMC;

(iv)    awarding ETMC damages against Cigna for breach of its duties to ETMC;

(v)     awarding ETMC damages against Blue Cross for interference with prospective business relations and economic advantage;

(vi)    awarding ETMC damages against Aetna for interference with prospective business relations and economic advantage;

(vii)   awarding ETMC damages against Cigna for interference with prospective business relations and economic advantage;

(viii)  awarding ETMC damages against Blue Cross for its violations of §§ 1301.051(a), 1301.051(b), and 1301.006(a);

(ix)    awarding ETMC damages against Aetna for its violations of §§ 1301.051(a), 1301.051(b), and 1301.006(a);

(x)     awarding ETMC damages against Cigna for its violations of §§ 1301.051(a), 1301.051(b), and 1301.006(a);

(xi)    awarding ETMC exemplary and/or punitive damages against Blue Cross;

(xii)   awarding ETMC exemplary and/or punitive damages against Aetna;

(xiii)   awarding ETMC exemplary and/or punitive damages against Cigna;

(xiv)   awarding ETMC costs, pre-judgment interest, and post-judgment interest in the amounts permitted by law; and

(xv)   awarding ETMC such other and further relief to which it may show itself justly entitled through the evidence at trial.

Respectfully submitted,

Of Counsel:

David C. Frederick
Eduardo F. Bruera
KELLOG HUBER HANSEN,
    TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326.7900
dfrederick@khhte.com
ebruera@khhte.com

_/s/ Otis Carroll_____
Otis W. Carroll, Jr.
State Bar No. 03895700
Collin M. Maloney
State Bar No. 00794219
IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway Avenue, Suite 500
(903) 561.1600
otiscarroll@icklaw.com
cmaloney@icklaw.com


T. John Ward
State Bar No. 20848000
Claire Abernathy Henry
State Bar No. 24053063
WARD, SMITH, & Hill PLLC
1127 Judson Road, Suite 220
Longview, TX 75601
(903) 757.6400
tjw@wsfirm.com
claire@wsfirm.com

Michael C. Coker
ADAMS & COKER, P.C.
State Bar. No. 04527100
4540 Kinsey Drive
Tyler, TX 75703
(903) 581.1196
mikecoker@adams-coker.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served on all counsel of record pursuant to Texas Rules of Civil Procedure 21 and 21a on this 25th day of September, 2015.

/s/ Otis Carroll
Otis W. Carroll, Jr.

## VERIFICATION

STATE OF TEXAS           §

COUNTY OF SMITH       §

Before me, the undersigned notary, on this day personally appeared Stephen P. Rydzak, M.D., the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

"My name is Stephen P. Rydzak, M.D. I am capable of making this verification. I have read Plaintiff's First Amended Petition and Application for Temporary Injunctive Relief. The facts stated in it are within my personal knowledge and are true and correct."

_____
Stephen P. Rydzak, M.D.

Sworn to and subscribed before me by Stephen P. Rydzak, M.D. on this 24th day of September, 2015.

LINA HAUK
My Commission Expires
March 7, 2018

_Lina Hauk_
Notary Public in and for
the State of Texas

My commission expires: 3/7/18

<u>**AFFIDAVIT OF STEPHEN P. RYDZAK, M.D.**</u>

STATE OF TEXAS         )
                               )

COUNTY OF SMITH       )

"My name is Stephen P. Rydzak, M.D.

I am over twenty-one (21) years of age, have never been convicted of a crime involving moral turpitude and am otherwise competent to give this Affidavit. I have personal knowledge of the items contained in this affidavit.

I am submitting this affidavit in support of East Texas Medical Center's (hereinafter "ETMC") Request for Temporary Injunction in the case styled East Texas Medical Center v. Blue Cross Blue Shield of Texas, et al.; Cause No. 15-1165 in the 241st Judicial District, Smith County, Texas.

1. I am a Physician employed by ETMC Healthcare Associates d/b/a ETMC First Physicians ("First Physicians"). I am medical director of ETMC First Physicians and medical director of the ETMC Wound Healing Center. I am the current Chair of the Department of Medicine at ETMC Tyler. I am the former President of the Smith County Medical Society. I am board certified in Internal Medicine, Hyperbaric Medicine and Wound Management. I serve on the Board of Directors of East Texas Medical Center Regional Healthcare System. I am familiar with the lawsuit referenced above, the petition filed by East Texas Medical Center, along with the Request for Temporary Injunction and the facts alleged therein and the same are true and correct.

2. As a practicing physician and employee of First Physicians, I am aware of the duties and obligations that exist for a practicing physician in Texas, and I am generally familiar with the preferred provider networks that I participate in on behalf of my patients. Further, as board member of East Texas Medical Center Regional Healthcare System (the "System"), I am generally familiar with the financial condition of the System and its subsidiaries, including East Texas Medical Center, and the impact that exclusion from Blue Cross Blue Shield of Texas's ("BCBS") preferred provider organization ("PPO") networks has on ETMC and the wider East Texas community that it serves.

3. As a practicing physician, I am a contracting physician with BCBS for its PPO networks in Texas, and thus am considered "in-network" for the PPO networks. That means that members of the BCBS PPOs may come to me for medical services pursuant to their insurance contracts and I treat those patients on an "in-network" basis. That is to say, my patients do not suffer a financial penalty by virtue of receiving services from me as opposed to receiving services on an "out-of-network" basis from another physician.

4. ETMC is a full service hospital serving Tyler, Smith County, and other parts of East Texas. It has the only Level 1 trauma center in East Texas, and is the only hospital in East Texas providing renal transplants and deep brain stimulation. The closest Level 1 trauma center is approximately 100 miles away in Dallas, Texas. Likewise, the closest facilities providing

1

renal transplants and deep brain stimulation are located in Dallas. Further, ETMC is one of only two hospitals in Smith County that provides inpatient psychiatric services, and the only hospital in East Texas that provides inpatient psychiatric services for children and adolescents.

5. ETMC's is a 501(c)(3) charitable organization with the following mission: "We continuously strive to bring an unmatched spirit of excellence to the art and science of healthcare. We measure our success by how our efforts improve the quality of life in East Texas." To that end, it is part of a system that maintains, inter alia, forty clinics and eleven hospitals serving thirty-nine counties in the greater East Texas area. ETMC is the System's largest hospital, and serves as the hub of the System's hub-and-spoke clinical operations. ETMC provides all primary care and specialty services directly as a community hospital. Additionally, healthcare services are provided in, or near, a patient's home location through the System's network of outlying hospitals and clinics. ETMC is a vital referral destination for those outlying locations and physicians.

6. All of the System's outlying hospitals are admitted in the BCBS PPO. Likewise, all of the physicians in First Physicians are admitted into the BCBS PPO networks, just as most, if not virtually all, physicians in the East Texas area are in-network with BCBS. Thus, the System's outlying hospitals and physicians are in-network preferred providers in the PPO, but the flagship hospital, ETMC, is out-of-network. This means that member-patients of the PPO may use the System's outlying hospitals and their physicians as in-network preferred providers, but generally may use ETMC only as an out-of-network provider. The exclusion of ETMC from the PPOs impedes and interferes with the System's and their physician's ability to provide the people of East Texas with seamless access to high quality health care. Members of the PPOs can obtain primary and/or secondary treatment at the System's outlying hospitals as preferred providers, but when referred to ETMC for tertiary treatment must elect to (i) receive that treatment on an out-of-network basis that is more expensive because of increased deductibles and co-payments, or (ii) go to an in-network provider not for medically-indicated reasons, but for better insurance coverage. The same is true for the many physicians who, like me, must refer patients to in-network facilities despite our desire to refer patients to ETMC. In this way, among others, Blue Cross knowingly and intentionally interferes with both ETMC's prospective economic advantage, and the System's mission. Indeed, by interfering with the clinical integration of services, the exclusion of ETMC from the BCBS PPOs undermines the goal of optimizing the efficacy of patient care and frustrates the core of the physician-patient relationship. That the System's outlying hospitals and its physicians are allowed to participate in the BCBS PPOs further underscores the unreasonableness of ETMC's exclusion. And this is all the more so with respect to services that are available only at ETMC.

7. As a physician, I see no legitimate reason for ETMC to be excluded from the PPO networks. The exclusion of ETMC from the PPO networks means that I cannot use ETMC as a treatment option for my patients because of the prohibitive financial penalty that such a decision imposes on my patients, even when I believe that ETMC would provide the best care, the optimum integration of clinical services and continuity of care that my patient's deserve.

8. I consider BCBS's decision to exclude ETMC from its PPO networks an intolerable intrusion and interference with my medical judgment as to where my patients would receive the best care, where they would receive the greatest benefit of integrated clinical services and where the continuity of care that occurs in one system is fully realized. The inability to refer patients to ETMC due to BCBS's wrongful exclusion of ETMC from its PPO networks has a direct and debilitating effect on ETMC.

9. ETMC is a critical part of the healthcare system in this area. Without its unique services and capacity to address the healthcare needs of the citizens of this area, patients will not be able to obtain the care that they need. ETMC has been given no reason by BCBS as to why it has been excluded from BCBS's PPO networks. Additionally, ETMC is the only non-specialty, not for profit hospital involuntarily excluded from the BCBS PPO networks in Texas. Further, the exclusion of ETMC from the PPO networks was cited by Moody's as the primary reason for its recent bond rating downgrade. A copy of the July 30, 2015 Moody's report is attached hereto as Exhibit 1-A.

10. Despite the fact that ETMC has been unreasonably excluded from BCBS's PPOs for a number of years, I consider each patient's treatment plan unique. Therefore, with each patient, the threat of irreparable harm to my ability to choose the right treatment option for that patient recurs with each patient visit.

11. As a board member of East Texas Medical Center Regional Healthcare Center, I am familiar with countless attempts by ETMC to obtain in-network status with BCBS. Despite our efforts, ETMC has not been given a fair, reasonable, and equivalent opportunity to apply to be designated as a preferred provider.

12. BCBS's unreasonable exclusion of ETMC from its PPO networks has caused and continues to cause irreparable harm to ETMC in the form of damage to the physician patient relationship as well as to financial stability of the System itself. Without ETMC, the other local and outlying services currently provided by the System could not exist, and the patients now utilizing those services would no longer be able to obtain the care that they need.

13. I understand that BCBS more than 73% of the PPO market in Smith County. Thus, their intentional and unreasonable exclusion of ETMC from their PPO market deprives ETMC of access to the substantial majority of the private insurance market. Access to the private insurance market is essential if ETMC is to remain in business to serve the medical needs of East Texas and Smith County. Unless BCBS is restrained from its continued unlawful exclusion of ETMC from the PPO networks, ETMC will no longer be able to maintain its operations and will suffer immediate and irreparable harm.

Further Affiant sayeth not.

3

STEPHEN P. RYDZAK, M.D.

SUBSCRIBED AND SWORN TO before me, the undersigned on this the 23ʳᵈ day of September, 2015, by STEPHEN P. RYDZAK, M.D., who is a person who is personally known to me, or who was identified to me by photo identification, to certify which witness my hand and official seal.



NOTARY PUBLIC
LINA HAUK
My Commission Expires
March 7, 2018
STATE OF TEXAS

Notary Public In and for the State of Texas

4

EXHIBIT
1-A



# MOODY'S
## INVESTORS SERVICE

## Rating Action: Moody's downgrades East Texas Medical Center Regional Healthcare System (TX) to Baa3; outlook remains negative

Global Credit Research - 30 Jul 2015

**$291M of rated debt outstanding**

New York, July 30, 2015 --

Moody's Investors Service downgrades East Texas Medical Center Regional Healthcare System's (ETMC's) bond rating to Baa3 from Baa2. This action affects approximately $291 million of outstanding bonds issued by Tyler Health Facilities Development Corporation and Wood County Central Hospital District. The rating outlook remains negative.

### SUMMARY RATING RATIONALE

The downgrade to Baa3 reflects ETMC's contraction in revenues and volumes, leading to a material downturn in financial performance in year to date FY 2015 performance and our expectation for suppressed results and debt service coverage over the near term. The system's exit out of four rural hospital markets will streamline capital spending but also put additional pressures on ETMC's flagship hospital in Tyler to generate cash flow. This pressure is further exacerbated by very competitive Tyler market and changing payor mix, amplified by ETMC's long-standing out-of-network status with all major commercial insurance companies for the Tyler facility.

Mitigating factors include a conservative debt structure, absence of any sizable derivatives, frozen pension plan and conservative asset allocation, limiting demand on finite capital. Unrestricted cash and investment has improved providing further headroom to the 65 days cash covenant.

### OUTLOOK

The negative outlook reflects our expectations for weaker financial performance in FY 2015 and into FY 2016 given volume and revenue pressures. Inability to stem the decline in financial performance and decline in liquidity may place pressure on the rating.

### WHAT COULD MAKE THE RATING GO UP

• Significant sustained improvement in financial performance and debt service coverage ratios as well as improvement in liquidity metrics

### WHAT COULD MAKE THE RATING GO DOWN

• Unabated downturn in financial performance over the next year and reduction in liquidity

• Increase in debt without stronger cash flow generation

### OBLIGOR PROFILE

The ETMC Regional Healthcare System is a system of primary, secondary and tertiary healthcare facilities and services located throughout East Texas. The system currently operates 9 acute hospitals and several other entities including clinics and specialty centers.

### LEGAL SECURITY

The obligated group is comprised of the parent corporation. All affiliate hospitals have executed a security interest of their revenues and receipts to the corporate parent in favor of the master trustee for the benefit of all bondholders. Additionally, each restricted affiliate signed an Undertaking Agreement which obligates each affiliate to make contributions to the extent necessary for due and punctual payments of principal and interest for all outstanding bonded debt. The restricted affiliates must adhere to all covenants in the master trust indenture. A mortgage via a deed of trust is also pledged on the Tyler, Athens, Jacksonville, and Quitman facilities. The system's covenants include: to maintain 65 days cash on hand, a ratio of debt to capitalization of less than 70%

and at least a 1.10 times rate covenant of the parent and the restricted affiliates. Headroom to the covenants is adequate.

USE OF PROCEEDS

Not applicable.

PRINCIPAL METHODOLOGY

The principal methodology used in this rating was Not-for-Profit Healthcare Rating Methodology published in March 2012. Please see the Credit Policy page on www.moodys.com for a copy of this methodology.

REGULATORY DISCLOSURES

For ratings issued on a program, series or category/class of debt, this announcement provides certain regulatory disclosures in relation to each rating of a subsequently issued bond or note of the same series or category/class of debt or pursuant to a program for which the ratings are derived exclusively from existing ratings in accordance with Moody's rating practices. For ratings issued on a support provider, this announcement provides certain regulatory disclosures in relation to the rating action on the support provider and in relation to each particular rating action for securities that derive their credit ratings from the support provider's credit rating. For provisional ratings, this announcement provides certain regulatory disclosures in relation to the provisional rating assigned, and in relation to a definitive rating that may be assigned subsequent to the final issuance of the debt, in each case where the transaction structure and terms have not changed prior to the assignment of the definitive rating in a manner that would have affected the rating. For further information please see the ratings tab on the issuer/entity page for the respective issuer on www.moodys.com.

Regulatory disclosures contained in this press release apply to the credit rating and, if applicable, the related rating outlook or rating review.

Please see www.moodys.com for any updates on changes to the lead rating analyst and to the Moody's legal entity that has issued the rating.

Please see the ratings tab on the issuer/entity page on www.moodys.com for additional regulatory disclosures for each credit rating.

Kevin Connolly
Analyst
Public Finance Group
Moody's Investors Service, Inc.
250 Greenwich Street
New York, NY 10007
U.S.A.
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

Lisa Goldstein
Associate Managing Director
Public Finance Group
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

Releasing Office:
Moody's Investors Service, Inc.
250 Greenwich Street
New York, NY 10007
U.S.A.
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653



MOODY'S
INVESTORS SERVICE

© 2015 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. AND ITS RATINGS AFFILIATES ("MIS") ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

MOODY'S CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS FOR RETAIL INVESTORS TO CONSIDER MOODY'S CREDIT RATINGS OR MOODY'S PUBLICATIONS IN MAKING ANY INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process or in preparing the Moody's Publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

Moody's Investors Service, Inc., a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's Investors Service, Inc. have, prior to assignment of any rating, agreed to pay to Moody's Investors Service, Inc. for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Investor Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

For Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail clients. It would be dangerous for "retail clients" to make any investment decision based on MOODY'S credit rating. If in doubt you should contact your financial or other professional adviser.

For Japan only: MOODY'S Japan K.K. ("MJKK") is a wholly-owned credit rating agency subsidiary of MOODY'S Group Japan G.K., which is wholly-owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO. Moody's SF Japan K.K. ("MSFJ") is a wholly-owned credit rating agency subsidiary of MJKK. MSFJ is not a Nationally Recognized Statistical Rating Organization ("NRSRO"). Therefore, credit ratings assigned by MSFJ are Non-NRSRO Credit Ratings. Non-NRSRO Credit Ratings are assigned by an entity that is not a NRSRO and, consequently, the rated obligation will not qualify for certain types of treatment under U.S. laws. MJKK and MSFJ are credit rating agencies registered with the Japan Financial Services Agency and their registration numbers are FSA Commissioner (Ratings) No. 2 and 3 respectively.

MJKK or MSFJ (as applicable) hereby disclose that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MJKK or MSFJ (as applicable) have, prior to assignment of any rating, agreed to pay to MJKK or MSFJ (as applicable) for appraisal and rating services rendered by it fees ranging from JPY200,000 to approximately JPY350,000,000. MJKK and MSFJ also maintain policies and procedures to address Japanese regulatory requirements.